**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**HENDEL MANUFACTURING COM-
PANY, INC., Respondent.**

**Cal. No. 502, Docket 72-1932.**

United States Court of Appeals,
Second Circuit.

Argued March 5, 1973.

Decided June 14, 1973.

Paul J. Spielberg, N. L. R. B., Washington, D. C. (Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Joseph A. Oertel, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Edward Schneider, Boston, Mass. (Philip Schneider and Brown, Rudnick, Freed & Gesmer, Boston, Mass., on the brief), for respondent.

Before LUMBARD and TIMBERS, Circuit Judges, and WYZANSKI, District Judge.*

WYZANSKI, District Judge:

Pursuant to § 10(e) of the NLR Act, 61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et. seq., the NLRB petitions for enforcement of its June 28, 1972 order, reported at 197 NLRB No. 179. The only issues are whether substantial evidence supports the Board's findings: first, that respondent company violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a) (1), by interfering with employees in the exercise of the rights guaranteed by § 7 of the Act, 29 U.S.C. § 157, and second, that since March 5, 1971, respondent company has been violating § 8(a)(5) and (1), 29 U.S.C. § 158(a)(5) and (1), by refusing to recognize the union;—and, in connection with the aforesaid findings, whether the Board was authorized

---

* Senior District Judge of the District of Massachusetts, sitting by designation.

to command the respondent company to bargain with the union, Local 164, International Ladies' Garment Workers Union.

This is a summary of the findings of the Board which are supported by substantial evidence.

About February 8, 1971, Kaufman, an assistant manager of the aforesaid union, scheduled for February 11 a meeting requested by one of the respondent's employees. Thirty-five of the company's employees attended and heard Kaufman describe what he regarded as the benefits and methods of unionization. He distributed blank cards authorizing the union to represent respondent's employees.

On the same day, February 8, the respondent's plant manager suggested to the respondent's president that he consider a wage increase. On February 10, the president agreed and the next day he advised the manager that the increase would be about four or five per cent. The same day he called an employees' meeting for that night. At the meeting the president advised the employees that he was giving a wage increase to the pieceworkers and that later he would look into the possibility of a raise for the hourly workers. Up to the time of this meeting, there is nothing in the record to show that the president knew of the union's organizing activities.

On February 11, following the president's speech, the manager and one of respondent's foremen reported that a union meeting was scheduled for that night. The day following, and again on February 16, the manager asked employees, "What is this I hear about the union?" He received somewhat evasive answers which were nonetheless indicative of union activity.

On February 18, at a meeting of employees convoked by him, the president stated he was aware of the organizing campaign, and set forth, not in the form of a threat but in the not unfamiliar paternalistic manner of some employers, what in the management's view were the plausible reasons why a union offered no advantages to the employees. He recommended that the employees form their own committee. Finally, he reminded employees that he had previously "mentioned" his intention to grant cost-of-living increases in accordance with past practice and he said that the company was in the process of implementing these increases when it heard of "this union stir" and decided that it was "advisable not to be accused of making changes at this time."

On the same day, the union held its second meeting. Cards embodying authorizations to the union to act as collective bargaining agent were given by thirty of the sixty-eight employees in the relevant unit at the February 11 union meeting, by thirteen additional employees who signed before the company president's February 18 speech but who delivered their authorization cards to the union at the second meeting, and by 5 other employees who signed after the speech and who delivered the cards to the union at the second meeting.

On February 19, the company's supervisor conversed with two employees, one of whom he approached and the other of whom approached him. In the first talk he solicited the employee's opinion about the union; in the second he answered the employee's questions by saying the union "won't be very good" because she would "have no work" and would "have to go home."

The plant manager on February 25 approached five employees during a coffee break to ask if they were talking about the union. On February 26, she suggested to an employee that "a few girls can talk it over to break the union."

On February 26, the president's brother and the plant manager questioned an employee about his wearing a union button and his taking notes. The same employee was asked on March 1 by the president whether he liked his working conditions and why he was wearing a union button.

On March 2, the union held its third meeting, and agreed to demonstrate the

next day. On March 3, twenty-seven employees for 20 minutes marched in front of the plant with union placards. During the picketing the union's representative, Kaufman, presented to the company's president the authorization cards and asked for recognition. The president did not reply.

On March 5, about thirty-seven supporters of the union picketed again. The plant manager and supervisor urged them to stop demonstrating and the manager told one employee that "it's too bad when this is over, you won't be around." She told another employee that if she left the plant the doors would be locked. Kaufman, without success, renewed the union's demand for recognition.

On March 9, the company president addressed another employee gathering. He stated that the respondent would not give in to a strike and that a strike might cause the company to lose customers or even to close. He pled for a chance "to solve our problems."

On the night of March 5, the union held another meeting at which those present voted to strike. On March 10, forty-five employees struck; twenty-four continued working. The walkout ended on May 10, by which time only fifteen were still on strike.

On its findings of facts, the Board concluded that the company violated § 8(a)(1) of the Act by the president's threats to reduce work or close the plant, by his suggestions that the employees form their own committee; and by his cancellation of the previously announced wage increase, by the coercive interrogations of the plant manager, the supervisor and the president's brother, by the supervisor's threat that there would be no work, by the plant manager's suggestion to employees that they could break the union, by her threat to discharge an employee for picketing on March 5, and by her telling another employee that the doors would be locked.

The Board also concluded that the union on March 5 and thereafter had a majority in an appropriate unit, and that the company by refusing to grant recognition had violated § 8(a)(5) and (1).

Thereupon, the Board ordered the company, first, to desist from what the Board had found to be unfair labor practices and from further conduct which in any like or related manner interfered with employees' § 7 rights; second, to make pieceworkers whole with six per cent interest as recompense for the wage increase which the Board concluded had been unlawfully withheld from the time of its lawful announcement on February 11 and which had been unlawfully cancelled on February 18; third, to bargain on request and, if an understanding be reached, to embody it in a signed agreement; and fourth, to post customary notices.

In response to the Board's petition to this court for enforcement of the aforesaid order, the company argues, first, that the president's announcement suspending the wage increase was made in good faith to avoid the appearance of a violation of law; second, that the president's speeches were not coercive; third, that the company's other officers and supervisors did not engage in coercive conduct; and fourth, that the Board's bargaining order is unwarranted since a valid election can be held.

■ The second and third of those arguments do not deserve our lengthy consideration. It is plain from our recital that what the Board found upon the basis of substantial evidence that the Board, relying on its expertise, was justified in concluding that there had been unlawful interference with the § 7 rights of employees in violation of § 8(a)(1) of the Act. Bourne v. NLRB, 332 F.2d 47 (2nd Cir., 1964); NLRB v. Dorn's Transportation Co., 405 F.2d 706 (2nd Cir., 1969); NLRB v. Gladding Keystone Corp., 435 F.2d 129 (2nd Cir., 1970). It should by now be plain that the courts are limited in their authority to review NLRB findings that an employer's conduct interferes with employees' rights of

association. We must not make *de novo* findings on the basis of our limited experience and competence, but must stop at the point where we are satisfied that the administrative body charged with primary responsibility had substantial evidence for its findings and conclusions. Here we are so satisfied.

█ Nor do we see any troublesome question raised by the respondent's fourth argument. It is well-settled that the Board may exercise wide, though not unfettered, discretion whether to issue a bargaining order on the basis of authorization cards executed by a majority of employees in an appropriate unit without conducting an election. NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The instant case falls clearly within the discretionary limits sanctioned by *Gissel* and we see no advantage in retreading the ground covered therein by Chief Justice Warren.

However, there is some plausibility to respondent's final argument. It is plain from the record that the company's president when he withdrew his suggested wage increase acted on the advice of an accountant. If this were a criminal proceeding, it might be that a corporation which followed the advice of a competent expert given in good faith could not properly be convicted of wrongdoing. But this is a civil matter in which the issue is whether what the president did was prohibited by the NLR Act, not whether what he did involved a criminal intent. The NLR Act *might* have been so drafted as to prohibit only intentional interferences by an employer with his employees' freedom of association. But that was *not* the Congressional choice. The legislative mandate prohibits interference whether intentionally interfering

or not, whether pursuant to *bona fide*, competent advice of an expert or not. Congress did not here give the protection available under some other statutes to those who act in good faith upon advice given by competent, honest lawyers, accountants, or other experts. See, for example, the protection afforded by Section 11 of the Securities Act of 1933 as amended, 15 U.S.C. § 77k(b)(3), and by Section 18 of the Securities & Exchange Act of 1934, as amended, 15 U.S.C. § 78r(a).

What the NLR Act does is to make the employer act at his peril. Moreover, the peril in the case at bar was not so great as respondent would have us believe. An employer who in good faith at a time when he did not know of union activity had promised a raise, when he learned of the union activity could have taken the position publicly that whether or not the union activity succeeded the raise would go into effect. That would have been a plain declaration of neutrality and no one rightly could have criticized it adversely. In that critical sense, the present case is distinguishable from NLRB v. Dorn's Transportation Co., *supra*, 405 F.2d at 714–715, in which Judge Smith counseled against the adoption of a "damned if you do, damned if you don't" approach. In *Dorn's*, the Trial Examiner had expressly found that if the employer had granted the wage increase "nothing could be clearer than that . . . the General Counsel would have alleged such action a violation of Section 8(a)(1)." Here, to cancel the raise was obviously susceptible of being understood by employees as interference with their union organizational efforts. And the Board was warranted in so finding and concluding.

Order enforced.