**STA–HI DIVISION, SUN CHEMICAL CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 76–1513.

United States Court of Appeals, First Circuit.

Argued April 7, 1977.

Decided Aug. 16, 1977.

Stanley R. Strauss, Washington, D. C., with whom Peter H. Kiefer, Chester H. Lopez, Jr., Vedder, Price, Kaufman, Kammhols & Day, and Hamblett, Kerrigan, LaTourette & Lopez, Nashua, N. H., were on brief, for petitioner.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Edmund D. Cooke, Jr., Atty., Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and MILLER,* Judge.

MILLER, Judge.

Sta-Hi Division of Sun Chemical Corp. petitions for review of a decision and order of the National Labor Relations Board ("board"),[1] and the board cross-petitions for enforcement of its order. In its decision, the board concluded that petitioner violated section 8(a)(1) and (3) of the National Labor Relations Act, as amended ("Act") (29 U.S.C. § 158(a)(1) and (3)).[2] The board ordered, *inter alia*,[3] that a representation election held on October 16, 1975, be set aside[4] and that the matter be referred to the Regional Director for the purpose of conducting a second election; also, that petitioner "Make its employees whole for the wages they lost in the period from August 4, 1975, to October 25, 1975, plus interest, as the result of its announcement on August 4, 1975, that it had canceled a raise because of the Union's organizing campaign."

* Hon. Jack R. Miller of the United States Court of Customs and Patent Appeals, sitting by designation.

1. Reported at 226 N.L.R.B. No. 123 (1976). One of the three members of the panel dissented in part.

2. 29 U.S.C. § 158(a) provides in part as follows:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization

29 U.S.C. § 157 provides as follows:
   Employees shall have the right to self-organization, to form, join, or assist labor or-

ganizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

3. The board's order also required petitioner to cease and desist from "[t]elling employees it has cancelled a raise because a union is engaged in a campaign to organize them," to post copies of a specified notice, to provide records needed to compute backpay, and to notify the Regional Director with respect to compliance.

4. The Union had lost the election 14–22.

## BACKGROUND

Sta-Hi occupies a small part of the plant (located in Nashua, New Hampshire) of Kollsman Instrument, another division of Sun Chemical. During the period involved (1975), Robert MacNally was the divisional Vice President and General Manager of the Sta-Hi portion of the plant, and Francis Haggerty was the senior Kollsman official at the plant. The labor relations aspects of the Sta-Hi operation were the responsibility of William Machaver, Vice President of Personnel and Industrial Relations for Sun Chemical, and of Stanley Rosen, Sun Chemical's Director of Labor Relations.

At a meeting in mid-June, employees asked MacNally about the possibility of a cost-of-living wage increase. His response was not encouraging. At another meeting of Sta-Hi employees on July 23, Haggerty told the employees that Kollsman was conducting an area wage survey which had not yet been completed. He did not state whether or not the employees could expect a raise as a result of the survey, and his answers to questions did not quiet the employees' unrest over their wages and other working conditions. MacNally was not present at the July 23 meeting, but he learned of the employees' questions and Haggerty's answers soon after. Although he had heard rumors of union interest among the employees, he was not aware at this time that the Union had undertaken an organizing campaign; nor did he think that unrest among the employees was a serious problem. However, on July 29, he telephoned Sun Chemical's headquarters in Fort Lee, New Jersey, with a view to having something done about the problem.[5] He talked to Rosen and recommended an immediate raise for the employees on the basis of the Kollsman survey, some of the details of which he had learned from Haggerty. Rosen reported MacNally's recommendation to Machaver and recommended a raise of eight percent. Machaver concurred and took the recommendation to the presi-

dent of Sun Chemical who, on the evening of July 30, approved an immediate raise of eight percent for Sta-Hi's hourly employees. Machaver told Rosen to relay the news to MacNally, which he did on the morning of July 31.

Later that morning MacNally called back and told Rosen that he had just received a letter from the Union claiming to represent Sta-Hi employees. Rosen instructed Mac-Nally to do nothing about the raise until he (Rosen) got back to him. Rosen reported the new development to Machaver and gave his legal opinion that it would be an unfair labor practice to implement the decision to grant a raise under the circumstances and recommended that the raise be cancelled. Machaver agreed, and Rosen reported the decision to MacNally. Accordingly, the raise was not announced to the employees.

Machaver went to Nashua on Sunday evening, August 3, to try to do something about the problem of unrest among the employees. He conferred with MacNally and his manufacturing manager in the morning and early afternoon of August 4. During the conference, MacNally received the copy of the representation petition the Union had filed with the board which had been mailed by the board's Regional Office on August 1. It was decided that an open meeting would be held with all of the employees. Machaver testified that he told MacNally that "if anything in the economic area comes up, we must tell them that by law we are prevented from making any comments that . . . could be construed to be coercive, or promises, or so forth."

The August 4 meeting lasted from around 3:30 until after 5:00 P.M., with Sta-Hi's 38 production and maintenance employees present, along with Machaver, Mac-Nally, the manufacturing manager, and a foreman. Machaver spoke for about fifteen minutes. He testified that, among other things, he told the employees:

> during 1974, when the Sta-Hi division started hiring following its move from California.

5. The wage structure in effect on July 28 had been established twelve months earlier and was based on the going rate in the Nashua area

. . . I wanted to discuss with them the fact that I did not believe a union was needed, but I would not be discussing it with them at this meeting; that my primary objective at this meeting was to find out what problems there were, to develop constructive relations between the management and the people, because that was the only way we found that we could run a profitable business that was to everybody's benefit.

The meeting was then opened for "comments, suggestions, criticisms, anything they had to offer that would be helpful to us to improve the situation." Machaver answered questions appropriately, taking care not to make statements that might be interpreted as promises of benefits if the employees would vote against the Union; and when a question called for such a response, he told the employees explicitly that was the reason for his not saying more.

Machaver testified that, at one point, when wages were being discussed, one employee said, in so many words:

Mr. Machaver, you know for a fact that the company never considered giving an increase, has no intention of giving an increase, and the only reason that you're here talking to us is because you want us to vote against the union. And, is it true if we do vote against the union, we're not going to get an increase anyway?

Thereupon, according to Machaver, he turned to MacNally and said:

"This comment is not really a question, Bob. It is designed to impugn the credibility of our company, the reputation of our company, and to really leave a feeling with the people that our word isn't worth anything."

. . . . .

"[T]he question in the form of a statement is false. Therefore, I think, within the law, we ought to tell the people the facts. Would you do so?"

According to Machaver, MacNally then said:

"Well, on Tuesday of last week . . . I called up Mr. Rosen, and told him that based on all the circumstances, namely

the meetings we've had with people, where there were complaints about wages, the fact that there were across-the-board increases being given in the area, and the general unsettlement in the plant, that we ought to give the people an increase.

"Bill, you ought to pick it up from here, because you know what happened after I talked to Stan Rosen."

Machaver testified that he continued from that point as follows:

"Mr. Rosen came to me, and told me that Mr. MacNally recommended an increase. He reviewed this survey information which he had, and made a recommendation to me.

"I then met with the president the following night, which was Wednesday night, and we arrived at a decision. On Thursday, when that decision was to be communicated to Mr. MacNally, we found there was a union petition. And at that point we could go no further, so we did not."

In November, following the representation election, petitioner placed a nine percent wage increase into effect, retroactive to October 25.

### OPINION

#### (1) *Section 8(a)(1) and (3) Violations*

Although the record does not show that petitioner, in *ipsis verbis,* "told its employees on August 4 that they would have received a wage increase but for the initiation of the union campaign," we are persuaded that the reasonable inference from William Machaver's statement, quoted above, was that because of the union representation petition a decision to increase wages (by how much and by what date *not* inferable) was not going to be carried out. We agree with the board that the words "we could go no further," in their setting, "effectively admitted that 'the decision' was to grant a raise; otherwise there would have been nowhere 'further' to go." Accordingly, we do not agree with petitioner's

argument that Machaver's statement was privileged under section 8(c) of the Act (29 U.S.C. § 158(c)).[6]

■ The Administrative Law Judge ("ALJ") found "no evidence, as of July 31, that Machaver's purpose in canceling the raise was anything other than protecting Respondent [petitioner here] from charges of unlawful conduct," and stated, with respect to the August 4 meeting, "I do not find that undermining the Union was uppermost in his mind when he spoke out." Petitioner argues that such findings preclude a holding that it violated either section 8(a)(1) or (3), citing this court's statement in *NLRB v. Otis Hospital*, 545 F.2d 252, 254, n.3, 93 LRRM 2778 (1st Cir. 1976):

> An employer violates section 8(a)(1) if the effect and purpose of his actions can be said to impinge upon the employees' right to unionize. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 [84 S.Ct. 457, 11 L.Ed.2d 435] (1964). A violation of section 8(a)(3) requires proof of a "discriminatory" act undertaken by the employer with the intent to prejudice his employees because of their membership or nonmembership in the union; "some element of antiunion animus is necessary." *NLRB v. Brown*, 380 U.S. 278, 286 [85 S.Ct. 980, 985, 13 L.Ed.2d 839] (1965).

However, the failure of the ALJ to specifically find that an antiunion animus was present in Machaver's August 4 remarks does not render unreasonable the board's conclusion that the foreseeable effect of those remarks was "to impinge upon the employees' right to unionize," resulting in, as the board argues, at least a violation of section 8(a)(1).[7]

■ We are not unsympathetic with an employer who, having decided to increase his employees' wages, finds himself trying to navigate a "perilous" course between the *Scylla* of a violation of the Act for granting a wage increase to his employees when a representation election is pending[8] and the *Charybdis* of a violation of the Act for withholding such an increase when such an election is pending.[9] His uncertain compass is the board's rule to act "as he would if a union were not in the picture." *The Great Atlantic & Pacific Tea Co.*, 166 N.L.R.B. 27, 28, n.1 (1967); *McCormick Longmeadow Stone Co.*, 158 N.L.R.B. 1237, 1242 (1966). The navigation was made more difficult here by the unseemly remarks of one employee, quoted above, which clearly required a meaningful response. Although Machaver labelled the remarks "false," more was required; and we do not regard as realistic the board's argument that petitioner "was free only to reiterate its assurance of sincere interest in the employees' well being, and to explain its inability to promise improvements at that time." On the other hand, the board's suggestion that "there was nothing to prevent the Company from announcing . . . that the wage increase would be put into effect immediately after the election, regardless of the outcome, with the Union's consent [if it won the election]," although somewhat inconsistent with the board's rule to act as if the Union were not in the picture, constitutes one approach that would have been both an effective response and a neutral response. See *NLRB v. Hendel Manufacturing Co.*, 483 F.2d 350, 353 (2d Cir. 1973). Doubtless a reviewing tribunal, far removed from the fray, could devise other

---

**6.** 29 U.S.C. § 158(c) provides:

> (c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

**7.** That Machaver's remarks were made more than two months before the election contrasts with the situation in *Colorado Seminary (Uni-*

*versity of Denver)*, 219 N.L.R.B. 1068 (1975), where the critical remarks were made a day before the election, but the difference would only affect the degree of impingement that could be foreseen.

**8.** *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); *NLRB v. Styletek, Div. of Pandel-Bradford, Inc.*, 520 F.2d 275 (1st Cir. 1975).

**9.** *NLRB v. Otis Hospital, supra.*

effective and neutral approaches that could have been used. Unfortunately, "Machaver's carefully chosen words" as petitioner calls them, were, technically, the wrong words.

In view of the foregoing, we affirm the board's decision that petitioner committed a section 8(a)(1) violation.[10]

### (2) *Order to Make Whole Employees for Wages Lost*

■ The ALJ ordered petitioner to "Make its employees whole for the wages they lost in the period from July 31 to October 25, 1975, plus interest, as the result of its decision on July 31, 1975, to cancel an 8-percent raise." However, the board found that petitioner's initial decision on July 31 to cancel the wage increase "was lawful and not a violation of Section 8(a)(3) and (1)," pointing out that no such violation had been alleged by the General Counsel in the complaint and that, as the ALJ himself found, petitioner's decision "was motivated by its good-faith desire to avoid committing the unfair labor practice of granting an increase in benefits after learning of a union campaign." Thereupon, it modified the order for petitioner to make whole to cover the period from August 4, 1975 to October 25, 1975, "as the result of its announcement on August 4, 1975."

As both the dissenting panel member and petitioner have pointed out, since the decision of July 31, 1975, to cancel the wage increase was lawful, the employees were not deprived of any wage increase by the mere "announcement" on August 4, 1975, of the lawful decision of July 31, albeit that the "announcement" itself constituted a violation of section 8(a)(1).[11] Thus, the board's order to make whole petitioner's employees, resting on a clearly erroneous rationale ("to provide for compensation . . . for wages they lost"), appears to

be neither accurate nor responsive to the policy of the Act. *See Nathanson v. NLRB,* 344 U.S. 25, 27, 73 S.Ct. 80, 97 L.Ed. 23 (1952); *Edison Co. v. Labor Board,* 305 U.S. 197, 236, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Morrison-Knudsen Co. v. NLRB,* 275 F.2d 914, 918 (2d Cir. 1960), *cert. denied,* 366 U.S. 909, 81 S.Ct. 1082, 6 L.Ed.2d 234 (1961). Recognizing the breadth of the board's discretion, we would be inclined to affirm or at least remand if a supportable rationale for the order to make whole were readily apparent even if unexpressed. But such is not the case before us. Petitioner's technical violation of section 8(a)(1) is sufficient to support the board's order that the election held on October 16, 1975, be set aside and a second election be held. However, with respect to the order to make whole, as appellant points out, the "announcement," which was made more than two months before the election, was not even cited in the Union's letter of objection to the election mailed to the board or in the Union's unfair labor practice charge. We simply do not see how this incident warrants compensation for "lost" wages since, by the board's own logic, no wages were lost. The record does not indicate that the make-whole order was regarded as a means of assuring employees the unfettered future exercise of organizational rights, the basis upon which our dissenting brother would affirm the board's order. Nor can we discover where it was suggested that such an order was necessary to eradicate employee resentment against the Union and assure them that support for the Union in the future will not result in further wage increase cancellations. While the board might conceivably obtain enforcement of a make-whole order on the basis of either rationale, had it been developed in the record or at least articulated by the board, post hoc rationalizations of counsel cannot serve to fill the gap. *NLRB*

---

10. The board's order appears designed to remedy this violation. We, therefore, do not reach the issue of the section 8(a)(3) violation, while expressing doubt that the ALJ's findings are sufficient to show the required antiunion animus.

11. We find no basis in logic and no citations of authority for the General Counsel's theory that the violation of section 8(a)(1) on August 4 "transformed the [lawful] character of the cancellation" on July 31. *Cf. Coppus Engineering Corp. v. NLRB,* 240 F.2d 564, 573 (1st Cir. 1957).

*v. Beth Israel Hospital,* 554 F.2d 477 at 482 (1st Cir. 1977), citing *NLRB v. Metropolitan Life Insurance Co.,* 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965).

The board's order to make whole petitioner's employees for wages lost is set aside.[12] The remainder of the board's order will be enforced.

COFFIN, Chief Judge, dissenting in part.

While I agree with the court that Sta-Hi violated § 8(a)(1) by blaming the union for the withholding of the wage increase, I would not set aside the Board's remedial backpay order. I think established principles require that this portion of the order be enforced, but even if the matter were doubtful, I think a remand is mandatory.

It is elementary that the Board's power to choose sanctions is "a broad discretionary one, subject to limited judicial review", *Fiberboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). A remedial order may not be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). *See also Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 186 n.3, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973); *NLRB v. Seven Up Bottling Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

To begin, there is no doubt that the backpay order in the case at bar, if not vitiated by any descriptive language, would be well within the Board's remedial powers. The August 4 announcement had been found to discourage the employees from exercising their § 7 right to organize by informing them that such activity carried with it a risk of economic injury. The backpay order would undo the effects of the § 8(a)(1) violation by restoring to the employees what Sta-Hi said had been withdrawn. This remedy, the Board could conclude, is

not only reasonably necessary to reassure the employees that they will be fully protected in the exercise of their right to organize but also appropriate as a means of deterring other employers from engaging in similar misconduct. *See NLRB v. Otis Hospital,* 545 F.2d 252, 257 (1st Cir. 1976). I observe that the general, if not uniform, practice of the Board in cases such as this is to award backpay beginning at the time of the unlawful act. *See Colorado Seminary,* 219 N.L.R.B. 1068 (1975); *cf. NLRB v. Otis Hospital, supra.*

While recognizing the force of these considerations, the court refuses to enforce this portion of the order because it believes it rests on a clearly erroneous ground: that is, that the August 4 announcement deprived the employees of a wage increase. I have difficulty understanding why the court insists on regarding the Board's remedial decision as defectively rationalized. It is pertinent to quote the troublesome portion of the Board's decision:

"[W]e find the initial decision by [Sta-Hi] on July 31, 1975 to cancel the wage increase was lawful and not a violation of [the Act] . . .. We shall therefore modify the recommended Order accordingly. Furthermore, we shall change the recommended make-whole order to provide for compensation to employees for wages they lost between August 4 and October 25, 1975, rather than July 31 and October 25, 1975."

While the Board did use the technically inaccurate language "compensation. . . for wages lost", making the employees whole for an economic injury simply cannot be the Board's rationale for the backpay order. Since the Board held that the July 31 decision to cancel the wage increase was lawful, it obviously knew that, in a technical sense, no wages had been lost. Unless we attribute an immediate loss of memory to the Board, the only plausible explanation is that this language was intended only to indicate the formula for determining the

---

12. The notice ordered to be posted should be modified to reflect our changes in the board's order. That portion of the board's order relating to records needed to compute backpay will also be set aside.

amount of the backpay, *cf. NLRB v. Otis Hospital, supra* at 257, and that the Board failed to state its actual justification for the backpay order because it assumed that—in light of its established practice—the justification would be obvious to all. If limited review and deference to the Board's remedial choices mean anything, I would think it is our obligation to find a reasonable interpretation for the Board's decision and not to set aside an order because inartful and technically inaccurate language appears in it.

While I would enforce the order, I can see the merit in insisting on less misleading language in Board opinions. Yet even if the Board's decision has to be taken as defectively rationalized, the proper course for the court would be to remand, rather than simply to refuse to enforce this portion of the order. *SEC v. Chenery,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) establishes the proposition that when an agency gives the wrong reasons for a supportable decision of law or policy, the reviewing court is to send the case back for a new determination. Accord *NLRB v. Metropolitan Life Ins. Co.,* 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); *see* 2 K. Davis, Administrative Law Treatise § 16.12 at p. 480 (1958 ed.). Since the backpay order could, even in the court's view, be supported, I think a remand is mandatory.

I would therefore not set aside the backpay provision of the Board's order.