NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

PILGRIM FOODS, INC., Respondent.

No. 78–1120.

United States Court of Appeals, First Circuit.

Argued Sept. 8, 1978.

Decided Dec. 29, 1978.

As Amended Jan. 26, 1979.

William M. Bernstein, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, and Joseph A. Oertel, Atty., Washington, D. C., were on brief, for petitioner.

Eugene M. Van Loan, III, Manchester, N. H., with whom Alan Hall, and Wadleigh, Starr, Peters, Dunn & Kohls, Manchester, N. H., were on brief, for respondent.

Before KUNZIG, Judge, U. S. Court of Claims,* CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

The National Labor Relations Board (Board or NLRB) seeks enforcement of its order: that Pilgrim Foods, Inc. (Company) cease and desist from engaging in unfair labor practices; that it offer discharged employee Sidney Basha full and immediate reinstatement; that it bargain with Local Union No. 633 of New Hampshire (Chauffeurs, Teamsters and Helpers) a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union); and that it post appropriate notices.

The case was heard originally in October, 1976, before an administrative law judge (ALJ) who died before he was able to render an opinion. The parties consented to the issuance of a decision by another ALJ based on the record of the October hearing. That ALJ's decision was affirmed in part and reversed in part by the Board. The Board, agreeing with the ALJ, found that the Company violated section 8(a)(1) of the Labor Relations Act, 29 U.S.C. § 158(a)(1), by creating the impression that the employees' union activities were under surveillance, by soliciting and dealing with grievances, by impliedly promising benefits and threatening reprisals to dissuade employees from supporting the Union, and by withholding a promised wage increase from George Huszar because he voted in the Board conducted election. Contrary to the ALJ, the Board found the Company violated section 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1), by discharging truckdriver Basha because he was active in the Union's organizational effort. The Board also reversed the ALJ and found that the Company violated section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), by refusing to recognize the Union.

In deciding whether to enforce the Board's order, we are limited to determining whether its findings are supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(e); *NLRB v. Matouk Industries, Inc.,* 582 F.2d 125, 128 (1st Cir. 1978).

Respondent is a New Hampshire corporation located in Greenville, New Hampshire. It is in the business of packaging and distributing food products. Early in December of 1975, truckdriver Robert Martin contacted the Union's business agent, Thomas Piper, and arranged an organizational meeting, which was held on Sunday, December 7, 1975, in the Company's parking lot. Five employees, Basha, Ronald Jones, Sheldon Stokes, Roland Caron, and Leslie Jones, attended and signed union authoriza-

tion cards. A second meeting was held at Basha's home on the following Sunday, at which time Piper was given the signed cards. Basha and Piper obtained an authorization card from Martin, who was hospitalized and unable to attend the meeting.

Piper telephoned plant manager Edwin West on the following day, demanding recognition of an eight man unit of truckdrivers, shippers, receivers, and mechanics. West refused. Piper also sent West a written recognition demand, dated December 15, 1975, to which the Company never responded.

On January 26, Robert Hinchee, the assistant plant manager, and Paul Santich, the president of the Company, met in Boston to discuss with the Board's regional director the Union recognition bid. Prior to the meeting, the two decided to discharge Basha, purportedly because he violated a new company rule when he failed to notify his employer by telephone that some merchandise was missing from a delivery.

Hinchee and Santich met with the Union at the Board's office and executed a Stipulation for Certification upon Consent Election setting forth the appropriate bargaining unit[1] and stipulating that the eight named employees were the only eligible voters. Basha was excluded from the list because he was a casual part-time employee and because he was being discharged. The parties agreed that voting eligibility issues resolved were final and binding on both parties.

During a break in the conference, Hinchee telephoned his secretary with instructions to cancel Basha's trip scheduled for that afternoon and ordered Basha to report to his office on the following morning. Hinchee discharged Basha on January 27, 1976, on the grounds that he violated the call-in rule on January 16. Basha maintained that he was unaware of the rule since it was posted at a time when he was laid off.

The election was held on February 12, 1976. Four of the eight stipulated employees voted for the Union and the other four voted against it. Additionally, four other employees, including Basha and Huszar, voted, but, because they were not on the stipulated lists, their votes were not counted.

The Union filed unfair labor practice charges February 17, 1976, and objections to the election on February 19, 1976. The Regional Director decided that, since the issues raised by the objections and challenges were identical, the two cases should be consolidated for a hearing.

I. *Section 8(a)(1) Violations*

A. *Creating the Impression of Surveillance*

The Board and the ALJ were in agreement that the Company violated section 8(a)(1) of the Act by creating the impression that the Union activities of the employees were under surveillance. This finding was based on the conduct of Hinchee. Hinchee contacted Jones and told him that he knew he was the "spokesman for the men," and suggested that Jones compile a list of employee grievances. The ALJ concluded that, through Hinchee, "Respondent revealed for the first time it was enough aware of union activity among its employees to know who was their leader, thus giving reason for employees to believe Respondent was keeping an eye on what they were up to." The Company contends that this statement did not create the impression of surveillance, for the conversation lasted but five minutes and the atmosphere at the Company had always been informal and open. It points out that, even before the inception of the Union recognition bid, Jones was purportedly the leader of the employees who frequently dealt with management concerning employee complaints. Thus, the Company argues that Hinchee's recognition of Jones as "spokesman," when placed in the context of the

---

1. "All full and regular part-time truckdrivers, shippers and receivers and truck mechanic employed by the employer at its Greenville, New Hampshire plant, but excluding all other employees, guards, professional employees and supervisors as defined in the Act."

established employment situation, was not violative of the Act. Even if looked at in isolation, the Company contends that the statement was ambiguous at best.

In *NLRB v. Rich's of Plymouth, Inc.,* 578 F.2d 880, 885 (1st Cir. 1978), we said, "The Act does not prevent an employer from acknowledging an employee's union activity, without more, *see NLRB v. Mueller Brass Co.,* 509 F.2d 704, 709 (5th Cir. 1975)." The "more" that is required to constitute creating an impression of surveillance has been, for example, continuous monitoring of employee telephone conversations, as in *Stone & Webster Engineering Corp. v. NLRB,* 536 F.2d 461, 468 (1st Cir. 1976), and threatening confrontations as in *P.S.C. Resources, Inc. v. NLRB,* 576 F.2d 380, 383 (1st Cir. 1978); *NLRB v. Prince Macaroni Manufacturing Co.,* 329 F.2d 803, 805 (1st Cir. 1964).

We found a violation of section 8(a)(1) in *Rich's of Plymouth, Inc., supra,* 578 F.2d 880, based on a single remark made to an employee who was known to the management as a union supporter, even though the episode was short-lived and the comment only obliquely referred to the employee's union activity.[2] There was, however, an intimidating quality to the remark. Here, on the other hand, a majority of the court believes that Hinchee's remark that Jones was a spokesman for the men could not under the circumstances be found to go beyond the mere recognition of union activity and into territory violative of the Act. For an activity to be an unfair labor practice it must "interfere with, restrain, or coerce employees in the exercise" of their lawful rights. 29 U.S.C. § 158(a)(1). We conclude that the finding of a violation of section 8(a)(1) based on the alleged surveillance is not supported by substantial evidence in the record as a whole.[3]

### B. Soliciting and Promising to Satisfy Grievances

Shortly after the Company initially received the Union recognition bid, Jones mentioned to Hinchee that the employees wanted an increase in pay and work hours. Early the next month, Jones told Hinchee that the organizing drive could have been avoided if Hinchee had increased the hourly wage. Hinchee instructed Jones to compile a list of company demands by the following Monday, January 12, so that the Company and the employees could see if they could negotiate themselves without the Union. Hinchee also contacted employee Stokes, suggesting that the employees compile a list and offered to help. Hinchee told Stokes that he could not guarantee anything, but that he would send the list to the home office in New York.

As directed, Jones, Stokes, Basha, and Caron presented their list to Hinchee. With Jones' aid, Hinchee expanded the list, including a provision that the agreed-to benefits be embodied in a binding contract by January 20, 1976, six days prior to the scheduled representation hearing. Hinchee duplicated the list and provided Jones with a copy for each employee. He told Jones that he would have to consult with Santich before getting back to him because Santich made the decisions.

After conferring with Santich, Hinchee met with Jones, Stokes, and Caron and explained that the Company could not provide a single item on the list because each was too expensive. Hinchee informed the employees that the Company had compared prices with another trucking company and found that the other company could do the work more cheaply than the Company could in the event that the employees received all the requested benefits. The ALJ found that Hinchee also said that the Company could not bargain with the employees di-

---

**2.** The store manager observed the employee write her telephone number on the back of a blank union authorization card for a fellow employee. He then called the employee aside and said, "Aida, I know that you are responsible for this." *NLRB v. Rich's of Plymouth, Inc.,* 578 F.2d 880, 884–85 (1st Cir. 1978).

**3.** The writer does not join with his colleagues in this view and would uphold the Board. In any event, the issue is not controlling, since the panel agrees that other conduct of the company did violate the Act.

rectly "until the Union was out of the picture." [4]

The ALJ found and the Board affirmed that, through Hinchee, the Company violated section 8(a)(1) of the Act when he solicited grievances and promised benefits. We agree. In *NLRB v. Exchange Parts Co.,* 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964), the Court delineated the reach of section 8(a)(1). "We have no doubt that it prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." The record supports the Board's conclusion that Hinchee's promises and conduct were calculated to impinge upon the employee's freedom of choice with respect to unionization. The ALJ stated: "It is obvious Hinchee's purpose in acting as he did was to try to head off unionization, hopefully before the Union's petition even got to the hearing stage, by satisfying the demands which had caused Respondent's employees to turn to the Union in the first place."

It is well established in this circuit that promises of benefits made by the employer just prior to a Board's certification election for the purpose of influencing the election constitute unfair labor practices under section 8(a)(1). *NLRB v. Rich's of Plymouth, Inc., supra,* 578 F.2d 880; *NLRB v. Arrow Elastic Corp.,* 573 F.2d 702 (1st Cir. 1978); *NLRB v. South Shore Hospital,* 571 F.2d 677 (1st Cir. 1978); *NLRB v. Otis Hospital,* 545 F.2d 252 (1st Cir. 1976); *NLRB v. Styletek, Division of Pandel-Bradford, Inc.,* 520 F.2d 275 (1st Cir. 1975).

The Company contends that no promises, either express or implied, were ever made by the Company to correct the employees' grievances. Citing *Uarco Inc. v. NLRB,* 216 N.L.R.B. 1 (1974), it maintains that Hinchee was merely soliciting employee grievances without holding out hope that they would

be granted. The Company points to the employees' knowledge that Hinchee was without power to award their requests, since all authority relative to employee benefits rested in Santich.

We find that this case is distinguishable from *Uarco Inc., supra,* and that it is governed by *Rich's of Plymouth, Inc., supra.* In *Uarco, Inc.,* the company held several pre-election meetings in order to explain the mechanics of the upcoming election. When the meetings were opened up for questions, the employees voiced their employment complaints, and the Board found that this amounted to an implied solicitation of grievances. The Board, with one member dissenting, found that, because the management made no promise to remedy the employee complaints and because any possible inference of a promise was negated by the employer's "no promise" responses, this did not amount to an unfair labor practice. The Board distinguished the situation from Board precedent, explaining "any logical anticipation of improved conditions which the employees otherwise might have had was clearly dispelled by the express, affirmative emphasis on the Employer's inability to make promises." (footnote omitted). *Id.* at 2.

Reviewing the record of Hinchee's conduct, we find that there was ample evidence from which the Board could infer that he did impliedly promise to remedy the employee complaints. Unlike the employer in *Uarco Inc., supra,* Hinchee was not merely a passive wailing wall for the employees; he actually made recommendations, helped pen and distribute the grievance list, and offered to and did bring the list to the attention of the management. To argue that the Company's behavior is insulated from criticism because the promises were made by an agent actually lacking authority to grant them is self-serving and would, if successful, create an easy way for an employer to skirt the law. *Accord, Hubbard Regional Hospital v. NLRB,* 579 F.2d 1251 (1st Cir.

---

4. Hinchee actually said that he "couldn't negotiate with [employees] until the Union was either in or out."

1978), where we rejected the hospital's contention that there was no section 8(a)(1) violation because the associate directors of the nurses did not have the authority to announce company policy.

The Company argues that, when Hinchee reported back to the employees that none of their proposed benefits could be granted, he thereby neutralized the earlier unfair labor practices. It focuses on Hinchee's language to the effect that the Company could not negotiate with the employees, since it would be illegal, and that he was precluded from so doing "until the Union was either in or out" as proof of a sufficiently specific repudiation.

In *NLRB v. Rich's of Plymouth, Inc.*, *supra*, 578 F.2d at 884, we stated:

> As we have noted in previous decisions, we are not insensitive to attempts by an employer to mitigate impermissible conduct, *see Sta-Hi Division, Sun Chemical Corp. v. NLRB*, 560 F.2d 470, 474 (1st Cir. 1977). Once the promises had been made, however, the requisite laboratory conditions for a representational election had been destroyed, and even good faith efforts to blunt their impact could not make it otherwise, *id.*

In *Rich's of Plymouth, Inc.*, the employer removed the grievance committee ballot box, while, in the instant case, the employer attempted to erase what had already been said and heard. Hinchee at no point, however, specifically repudiated his prior unlawful conduct. Instead, while reviewing the list of demands, he mentioned in general terms that an additional reason for denying the benefits was that it would be illegal. We conclude that here, as in *Rich's of Plymouth, Inc.*, the employer's attempt to rectify the harm (if, indeed, it may be called that) was inadequate. *See NLRB v. Gerbes Super Markets, Inc.*, 436 F.2d 19, 21 (8th Cir. 1971); *Armstrong Tire and Rubber Co.*, 111 N.L.R.B. 708, 719 (1955).

██ The Company also posits that no violation should be found because the employees consented to Hinchee's conduct. Just because the employees may have enlisted Hinchee's help does not mean that he was free to behave as he did. In *Medo Photo Supply v. NLRB*, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944), the employees approached their manager and told him that, if they could negotiate their own wage increase, there would be no need for the union. As in the instant case, they submitted a list of grievances, which the employer promised to grant. The Court rejected the company's argument that there was no violation because the activity was initiated by the employees.

> Petitioner was not relieved from its obligations because the employees asked that they be disregarded. The statute was enacted in the public interest for the protection of the employees' right to collective bargaining and it may not be ignored by the employer, even though the employees consent, *Labor Board v. Newport News Co.*, 308 U.S. 241, 251 [60 S.Ct. 203, 208, 84 L.Ed. 219], or the employees suggest the conduct found to be an unfair labor practice, *National Licorice Co. v. Labor Board, supra*, 353 [309 U.S. 350, 60 S.Ct. 569, 572, 84 L.Ed. 799 (1940)], at least where the employer is in a position to secure any advantage from these practices, *H. J. Heinz Co. v. Labor Board*, 311 U.S. 514, 519–521, 61 S.Ct. 320, 85 L.Ed. 309, and cases cited.

*Id.* at 687, 64 S.Ct. at 834. The Company was under an obligation to follow the dictates of the Act, which meant that Hinchee, regardless of the employees' encouragement, was prohibited from soliciting and promising benefits. The employer was in a position to secure a benefit from the unfair labor practice, *i. e.*, heading off the Union.

The Company further argues that, because the Union representative informally authorized the employees to negotiate with Hinchee, there was no violation. This argument fails, for there is nothing in the record to indicate that Hinchee or the Company was even aware of Piper's authorization until the representation meeting on January 26, 1976, which was subsequent to Hinchee's solicitation and promises of benefits.

#### C. Threats of Reprisal and Cancellation of a Promised Wage Increase

There is substantial evidence to support the Board's finding that, by telling Jones that he would cut employees' hours or hire more drivers if the Union were successful, Hinchee violated section 8(a)(1). This threat of reprisal clearly violated the Act for it related to something over which Hinchee had at least partial control. *NLRB v. Gotham Industries, Inc.*, 406 F.2d 1306, 1314 (1st Cir. 1969); *NLRB v. Sandy's Stores, Inc.*, 398 F.2d 268, 270 (1st Cir. 1968); *NLRB v. Pioneer Plastics Corp.*, 379 F.2d 301, 303–04 (1st Cir.), *cert. denied*, 389 U.S. 929, 88 S.Ct. 292, 19 L.Ed.2d 281 (1967).

The Board found that Hinchee's cancellation of Huszar's raise because he participated in the election, violated section 8(a)(1) of the Act. On February 5, 1976, Huszar told Hinchee that he was quitting to take a job that paid thirty cents more per hour. Hinchee asked Huszar if he was in the unit that was to vote in the upcoming election, and, when Huszar replied that he was not, Hinchee agreed to give him the raise. However, Hinchee explained that he would grant the raise on February 19, a week after the election, but make it retroactive to February 5. Although he was not included on the *Norris-Thermador*[5] list of stipulated voters, Huszar decided to participate in the Union election. On February 13, the day after the election, Hinchee told Huszar the raise was cancelled because it was illegal for him to give a raise to an employee who voted in the election. Upon hearing this, Huszar quit.

It is agreed that granting the raise was legal, since the Company gave it to Huszar under circumstances unrelated to the pending election. The denial of that raise was viewed by the ALJ as "penalizing him [Huszar] for doing that which he had a right to do." *See Sta-Hi Division, Sun Chemical Corp. v. NLRB*, 560 F.2d 470, 474 (1st Cir. 1977); *NLRB v. Otis Hospital,*

*supra*, 545 F.2d at 255; *General Motors Acceptance Corp. v. NLRB*, 476 F.2d 850, 853–54 (1st Cir. 1973). The Company contends that the raise was withheld in good faith pending the decision of the Board concerning Huszar's challenged ballot. Hinchee explained to Huszar that he could not give him the raise, since it would be illegal and would look like a bribe.

In *Sta-Hi Division, Sun Chemical Corp. v. NLRB, supra*, 560 F.2d at 474, we found that, despite the good faith attempt of the employer to steer clear of a section 8(a)(1) violation, his conduct nevertheless ran afoul of the Act. Here, particularly in light of Hinchee's other violations, we conclude that substantial evidence supports the Board's finding. In *General Motors Acceptance Corp. v. NLRB, supra*, 476 F.2d at 854, we intimated that, if presented with a good faith, though erroneous, effort to comply with the mandates of the law, we might not find a violation. However, in that case, as here, the timing of the employer's conduct, coupled with the company's opposition to the union and other violations of the Act, were factors which overrode the good faith defense. *But see NLRB v. Dorn's Transportation Co.*, 405 F.2d 706 (2d Cir. 1969), where the employer prevailed on a good faith defense.

#### II. Section 8(a)(3) Violation—Discharge of Sidney Basha

On this issue, the Board, with one member dissenting, disagreed with the ALJ, finding that, by discharging Basha, the Company violated section 8(a)(3). As in *NLRB v. Matouk Industries, Inc., supra*, 582 F.2d 125, we are presented with an issue where the Board drew a different legal conclusion from the facts than did the ALJ. As stated in *Matouk*, "In such cases the Board's special understanding is at least as important an aid in interpreting the facts as the ALJ's immersion in the case." *Id.* at 128. In the instant case, the ALJ who

---

5. The Board held in *Norris-Thermador Corp.*, 119 N.L.R.B. 1301 (1958), that when parties provide in a signed agreement that eligibility issues will be final and binding, such agreement will be given effect unless it is contrary to the provisions of the National Labor Relations Act or to Board policy.

wrote the decision did not conduct the hearing. Therefore, his findings were not based on the unique opportunity to assess the credibility and demeanor of the witnesses, but are drawn solely from the record. Since the ALJ was not immersed in the case in the traditional sense, we feel that deference should be accorded the Board's decision.

The ALJ concluded that General Counsel did not establish by a preponderance of the evidence on the record considered as a whole that the Company's stated reason for discharging Basha was pretextual. The Board found to the contrary, because the Company's proffered reasons did not, in its view, withstand scrutiny. Although the question is a close one, in light of the special procedural circumstances of this case we uphold the Board.

In *NLRB v. South Shore Hospital, supra,* 571 F.2d at 682, we set forth the guidelines for determining whether there has been an illegal discharge. The Board must first establish that the employer had knowledge of the employee's union activity. *Stone & Webster Engineering Corp. v. NLRB, supra,* 536 F.2d at 464; *NLRB v. Gotham Industries, Inc., supra,* 406 F.2d at 1310. Although the Company contends that they did not know how Basha felt about the Union, both the ALJ and the Board found that the Company suspected that all of the employees favored the Union and Hinchee so stated. Knowledge of the employee's union activity may be implied from the facts and circumstances involved. *NLRB v. South Shore Hospital, supra,* 571 F.2d at 683; *NLRB v. Joseph Antell, Inc.,* 358 F.2d 880 (1st Cir. 1966).

The Board must next show that the discharge was improperly motivated and if the Company offers a legitimate business justification for its conduct, the burden shifts to the Board to establish by substantial evidence an affirmative and persuasive reason why the employer rejected the good cause and chose the bad one. *NLRB v. South Shore Hospital, supra,* 571 F.2d at 682. The Company's "good cause" for discharging Basha was that he violated an "important"

Company rule when he made a delivery that was two cases short without telephoning in the shortage to the plant. Basha testified that he was without knowledge of the rule because it was promulgated during a time when he had been laid off. The Board contends, and we agree, that it shouldered its burden and demonstrated that the Company's excuse was pretextual.

On this point, the Board and the ALJ part ways. Instead of examining Basha's infraction and the Company's reason for the discharge, the ALJ mistakenly looked to whether the firing would serve anti-union purposes. He concluded that, because the Company thought *all* employees favored the Union, ridding itself of only Basha would not unseat the majority support, hence the discharge must not have been motivated by anti-union sentiment.

The Board reviewed the facts, focusing, and we believe correctly, on Basha's infraction and the Company's stated reason for the discharge. It pointed to Basha's lack of notice of the new rule, the fact that the violation was a technical one, that the punishment was harsh in light of past Company precedent, and that Basha's work record was unblemished, to support its conclusion that the excuse given was pretextual. Direct evidence of motive is elusive and the Board may infer intent from surrounding circumstances. *NLRB v. South Shore Hospital, supra,* 571 F.2d at 682. Substantial evidence in the record supports the Board's finding that Basha would not have been discharged but for his union activity. *Coletti's Furniture, Inc. v. NLRB,* 550 F.2d 1292, 1293 (1st Cir. 1977).

### III. *The Bargaining Order*

We come now to the most troublesome aspect of this case. Because five of the eight employees in this unit executed valid authorization cards and the Company ignored their demand, the Board, unlike the ALJ, found a violation of section 8(a)(5) and (1) and issued a bargaining order. This extraordinary mandate was necessitated, according to the Board, because the Company

upon receiving the Union's demand, embarked on a course of serious unfair labor practices of discharging an employee for his union activity; creating an impression of surveillance of its employees' activities; soliciting and dealing with grievances in order to discourage union activities; promising benefits if its employees would refrain from union activity; threatening reprisals if its employees did not refrain from union activity; and withholding a promised wage increase because an employee had voted in a Board conducted election. The unfair labor practices involved all employees in the unit [footnote omitted], and, taken together, undermined the Union's majority status. [footnote omitted]. We find that they were so pervasive and widespread that their coercive effects cannot be eliminated by traditional remedies, and the possibility of conducting a fair election is impossible.

The leading case on the propriety of the issuance of bargaining orders is *NLRB v. Gissel Packing Co. Inc.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, *reh'g denied*, 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969). The Supreme Court divided unfair labor practices into three separate categories, with appropriate remedies supplied for each. First, in "exceptional" situations, marked by "outrageous" and "pervasive" unfair labor practices, a bargaining order is the appropriate remedy if the practices are so coercive that their effect precludes the holding of a fair and reliable election. This is compelled even where there has not been a showing of a card majority. *Id.* at 613–14, 89 S.Ct. 1918. Second, in less extreme cases, "marked by less pervasive practices," a bargaining order may issue where the majority has been undermined and there was a showing that, at one point, the Union had majority. *Id.* at 614, 89 S.Ct. 1918. Third, no bargaining order may issue when the unfair labor practices are "minor" or "less extensive," because of their minimal impact on the election machinery.

Looking at the language in the Board's decision, we discover that it charged that the Company "undermined the Union's ma-jority status" and that their practices were "so pervasive and widespread that their coercive effects cannot be eliminated by traditional remedies" and "a fair election is impossible." Although the language glows with Supreme Court sanctioned terms, the Board failed to go beyond semantics and give specific examples and precise reasons for this extreme remedy. We noted recently in *NLRB v. Matouk Industries, Inc.*, *supra*, 582 F.2d at 130.

> We share with other circuits, however, concern that the Board, in issuing bargaining orders, which are extreme remedies, is doing so without adequately explaining its reasons or performing the kind of analysis necessary to permit a court of appeals to perform its statutory review obligations. *See, e. g., NLRB v. Armcor Industries, Inc.*, 535 F.2d 239, 244 (3d Cir. 1976); *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1118–19 & n. 16 (7th Cir. 1973).

Although there we found substantial evidence supporting the Board's characterization of the employer's conduct and upheld the issuance of the bargaining order, we cautioned that, where the Board fails to support its conclusions with reasoning that we can evaluate, we will remand for further proceedings. *Id.* at 130.

The Board apparently construed the Company's behavior as fitting into the second category of *Gissel*, for it concluded that the five authorization cards constituted a valid demand to bargain. However, the Board's bare conclusory language alone does not a *Gissel* situation make. In *Gissel*, the Supreme Court directed that the Board take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. *Id.* at 614, 89 S.Ct. 1918. The Board failed to do so in its decision here.

In *NLRB v. Armcor Industries, Inc.*, No. 77–1495 (3d Cir. May 1, 1978), the court denied enforcement of a bargaining order after previously remanding the case to the Board for clarification of the justification for the

order. The bargaining order was denied because the Board, even given two chances, failed to specify the residual and continuing impact of the unfair labor practices. The court held: "Unless the Board can demonstrate that the present employees are so intimidated that they probably cannot make a knowing and free choice in a supervised election, we should not enforce a bargaining order." *See also First Lakewood Associates v. NLRB*, 582 F.2d 416, 424 (7th Cir. 1978), where the court concluded that the extraordinary remedy of a bargaining order was both unnecessary and improper because the Board failed to explicate the specific findings that would support the issuance of the order. In the instant case, we find the Board's conclusion that the Company's unfair labor practices so undermined the Union that a fair election would not be possible is not supported by substantial evidence. The Board is silent as to the future impact of the Company's unfair labor practices and whether the conduct is likely to recur in the future. The Board did not articulate why ordinary remedies would not be effective.

Although we are conscious of the Board's special expertise in fashioning remedies and the deference generally accorded its judgment, *NLRB v. Matouk Industries, Inc., supra*, 582 F.2d at 130, we also recognize the Supreme Court's mandate in *NLRB v. Gissel Packing Co., Inc., supra*, 395 U.S. at 615, that no bargaining order issue where the impact of the unfair labor practices upon the election machinery is minimal. We do not remand this case to the Board for further findings because our review of the record convinces us that the unfair labor practices fall within the third *Gissel* category. As noted in *Walgreen Co. v. NLRB*, 509 F.2d 1014, 1017 (7th Cir. 1975), where Board findings are inadequate, the court has, in many instances, itself analyzed the record to determine whether a bargaining order should be enforced. This approach, which was approved in *First Lakewood Associates v. NLRB, supra*, 582 F.2d at 423–24, avoids needless delay.[6]

Reviewing the unfair labor practices in this case, we note that the section 8(a)(1) violations were committed by Robert Hinchee, purportedly in ignorance of the law. The Company draws our attention in its brief to the fact that Hinchee no longer works for the respondent and four other employees have voluntarily terminated their employment with the Company since the Board hearing. The residual nature of Hinchee's conduct is, therefore, lessened by his departure and that of the other employees, as is the likelihood of the recurrence of his conduct. The record does not indicate that the employer will continue the unfair labor practices, since Hinchee's section 8(a)(1) violations ceased when management was apprised of them. The record does not support an inference that the Company would ignore the Board's cease and desist order.

In *NLRB v. Cott Corp.*, 578 F.2d 892, 894–95 (1st Cir. 1978), while passing on a question involving successor employers, we acknowledged that the Supreme Court in *NLRB v. Gissel Packing Co., supra*, 395 U.S. at 602, made it clear that an election remains the preferred method to determine a bargaining unit's representative and that a bargaining order should be enforced only when an election is not feasible. There have been no concrete reasons given by the Board as to why a fair election is not now feasible.

The cease and desist portion of the Board's Order is enforced except to the extent that it orders the Company to cease creating the impression of surveillance. The bargaining order is vacated. The remaining portions of the Board's Order, including the order to offer Sidney Basha reinstatement, are enforced.

---

6. *See Walgreen Co. v. NLRB*, 509 F.2d 1014, 1018 n. 5 (7th Cir. 1975), where the court detailed the ponderous proceedings of several cases remanded to the Board for further findings to support the bargaining orders.