**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**OTIS HOSPITAL, Respondent.**

No. 76–1138.

United States Court of Appeals, First Circuit.

Nov. 15, 1976.

Susan. Tepper Papadopoulos, Atty., Bethesda, Md., with whom John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert Sewell, Washington, D. C., Atty., were on brief, for petitioner.

Julius Kirle, Boston, Mass., for respondent.

\* Sitting by designation

1. The Board ordered respondent to cease and desist from its unfair labor practices, to pay its employees the wage increases that were withheld on January 1, 1975, retroactive to that date with 6 percent interest, and to post appropriate notices of the Board's order. The exact amount of the increase was left to be determined voluntarily by the parties or, if necessary, in a back pay proceeding.

Before COFFIN, Chief Judge, CLARK, Associate Justice, U. S. Supreme Court (Ret.),\* CAMPBELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order [1] issued after respondent was found to have committed unfair labor practices in violation of sections 8(a)(1) and (a)(3) [2] of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) & (a)(3). The unfair practices stemmed from respondent's withholding of a promised wage increase purportedly for the purpose of pressuring employees in their decision as to unionization.

The Administrative Law Judge and the Board found substantially as follows: Respondent (the "employer") operates a 110-bed private hospital in Cambridge, Massachusetts, for the chronically and terminally ill. Prior to 1975, the employer followed a policy of granting selective wage increases in varying amounts to employees as individuals or in categories. The only exception to this policy was an across-the-board increase granted to all employees in 1972 after the federal wage freeze was lifted. On October 2, 1974, the hospital Administrator, Mr. Hesenius, who exercised complete control over the hospital's operation and had authority to grant wage increases, issued a memorandum to "All Department Heads, Subject: Cost of Living Raise", announcing: "Effective January 1, 1975, there will be a cost of living raise." There was testimony that this memorandum was posted on bulletin boards on all floors of the hospital. The Administrative Law Judge found that Hesenius' use of the term "cost of living" was inadvertent, and that the notice should

2. Section 8(a) provides, in pertinent part:
"It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 . . .
\* \* \* \* \* \*
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . ."

have read "across-the-board" increase. Mr. Hesenius conceded in testimony that prior to posting the notice he had decided to give "some" wage increase, although the exact amount would be determined only by reviewing the hospital's costs and financial situation at the end of the year in December.

Several weeks after the posting of this notice, in late October, 1974, Massachusetts Hospital Workers, Union Local 880, Service Employees' International Union, AFL–CIO, began an organizing campaign at the Hospital. By November 1, 1974, the union had achieved the necessary support to file a representation petition with the Board, and an election was scheduled for January 8, 1975. The election later was stayed pending review of the unit determination by the Board.

No wage increase was in fact granted on January 1, 1975, as promised, and Nurse's Aide Mary Campbell brought this to the attention of Mr. Hesenius on January 9, 1976. At that time, Hesenius told Campbell "that he did not know what he could do about the raise, . . . that at the time when the notice was posted he had never stated the 'exact amount' and . . . that because of the fact 'that the union was around' he did not know just what he could give." Campbell then inquired whether Hesenius would grant the promised increase if Campbell obtained from the union a letter promising that it would not complain about any increase granted at that time. Hesenius declined the offer, replying that he "just didn't know if it would be a proper thing to do." Having failed to persuade Hesenius to grant the increase, Campbell then asked him whether she could relate to the Hospital's employees Hesenius' two reasons for not granting the increase: the Union's presence and the uncertainty of the amount promised. Hesenius consented to the request. The day following Campbell's conversation with Hesenius, Hesenius called Campbell into his office and asked her whether she knew that he was to receive a letter from the union charging him with committing an unfair labor practice by not granting an across-the-board increase.

From these facts the Administrative Law Judge concluded, with the Board thereafter concurring, that respondent had violated sections 8(a)(1) and (a)(3) of the Act by withholding the announced wage increase.[3] The Judge and Board also concluded that in informing Campbell that the wage increase would not be granted because "the union was around," and in interrogating Campbell about the union's letter, respondent committed additional, separate 8(a)(1) violations.

Withholding a wage increase during a union organizing campaign has been held to violate section 8(a)(1) of the Act under any of three conditions: if the increase was promised by the employer prior to the union's appearance; if it normally would be granted as part of a schedule of increases established by the employer's past practice;

---

**3.** Neither the Administrative Law Judge nor the Board distinguished between sections 8(a)(1) and (a)(3), though the statutory language and case law suggest that the requirements for establishing violations of each section differ. An employer violates section 8(a)(1) if the effect and purpose of his actions can be said to impinge upon the employees' rights to unionize. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). A violation of section 8(a)(3) requires proof of a "discriminatory" act undertaken by the employer with the intent to prejudice his employees because of their membership or nonmembership in the union; "some element of antiunion animus is necessary." *NLRB v. Brown*, 380 U.S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed.2d 839 (1965). Despite their different requirements, however, the coverage of these two sections overlaps, and a few courts have found the withholding of benefits because of union activity violative of sections 8(a)(1) and (a)(3). *See G.A.F. Corp. v. NLRB*, 488 F.2d 306, 308 (2d Cir. 1973); *United Steelworkers of America v. NLRB*, 132 U.S.App. D.C. 103, 405 F.2d 1373, 1375 (1968). We find it unnecessary here to draw a precise distinction between the two sections since it appears that respondent was, at very least, in violation of section 8(a)(1), and the Board's order is designed to remedy that violation. We therefore analyze the unfair labor practice by reference to that section only. *Compare NLRB v. Scrivener*, 405 U.S. 117, 125, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972).

or if the employer attempts to blame the union for the withholding. *G.A.F. Corp. v. NLRB*, 488 F.2d 306, 308 (2d Cir. 1973); *NLRB v. Dothan Eagle, Inc.*, 434 F.2d 93, 98 (5th Cir. 1970); *NLRB v. Dorn's Transp. Co.*, 405 F.2d 706, 715 (2d Cir. 1969); *NLRB v. Agawam Food Mart, Inc.*, 386 F.2d 192 (1st Cir. 1967); *NLRB v. Longhorn Transfer Serv., Inc.*, 346 F.2d 1003, 1005–06 (5th Cir. 1965). The common rationale of these cases is that withholding a wage increase in these circumstances has the obvious effect of discouraging employees from exercising their right to organize and bargain collectively. On a similar theory, to grant benefits during a union organizing campaign has been held to violate section 8(a)(1) if, at the time, the employer knew or should have known that a union was organizing or that an election was pending, and if the benefits were granted with the purpose of interfering with the employees' rights to organize. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 430 (1964); *D'Youville Manor v. NLRB*, 526 F.2d 3 (1st Cir. 1975); *NLRB v. Styletek, Div. of Pandel-Bradford, Inc.*, 520 F.2d 275, 279 (1st Cir. 1975); *NLRB v. Gotham Indus.*, 406 F.2d 1306, 1309 (1st Cir. 1969).

Employers, with some justification, have argued that there is a potential for confusion and unfairness in rules that may make it illegal, on the one hand, to withhold and, on the other hand, to grant, a wage increase. But neither course has been declared illegal *per se*. It becomes so only if the employer is found to be manipulating benefits in order to influence his employees' decision during the union's organizing campaign. *NLRB v. Dothan Eagle, Inc., supra; NLRB v. Dorn's Transp. Co., supra; Armstrong Cork Co. v. NLRB*, 211 F.2d 843 (5th Cir. 1954). The Board has said "[A]n employer, in deciding whether to grant benefits while a representation proceeding is pending, should decide the question as he would if a union were not in the picture . . . ." *The Great Atlantic & Pacific Tea Co.*, 166 N.L.R.B. 27, 29 (1967). This, like much advice, is, of course, easier to give than to put into practice. We have observed that to proceed during an election campaign as if the union was not on the scene "is obviously perilous unless the employer can support with very specific facts the reason for granting benefits just then." *NLRB v. Styletek, Div. of Pandel-Bradford, Inc., supra*, 520 F.2d at 281 n.5. We followed that observation, however, with the statement that "[a] past history of annual wage adjustments on a particular date, or the like, would be an example of clear-cut factual support." *Id.* By this language, we meant to indicate that under well-defined conditions, where the prospective benefits were already incorporated in the existing terms and conditions of employment, an employer could grant the benefits without fear of violating section 8(a)(1). It follows, conversely, that a refusal to grant the benefits in these circumstances would likely be illegal, since withholding them would constitute a change in existing conditions.

Here, notwithstanding the employer's claim that he withheld the previously announced raise merely for fear of being charged with an unfair labor practice, we think there is substantial evidence to support the Board's conclusion that respondent was otherwise motivated and that he violated the Act. Mr. Hesenius had publicly announced on October 2, 1974, that effective January 1, 1975, there would be what he then termed a cost of living raise. That unequivocal undertaking amounted to a promise that the Board properly found became part of the existing terms and conditions of employment prior to the union's appearance. *See NLRB v. United Aircraft Corp., Hamilton Standard Div.*, 490 F.2d 1105, 1109 (2d Cir. 1973); *Pacific Southwest Airlines*, 201 N.L.R.B. 647 (1973). The employer's withholding of the increase after January 1, 1975, was, on the same premise, a change in those conditions, in violation of section 8(a)(1). *See NLRB v. Dothan Eagle, Inc., supra.*

It is true than Hesenius did not indicate how much the increase would be. Respondent argues that this indefiniteness prevented the undertaking from becoming part of the conditions of employment existing when the union came on the scene. But the

timing and general applicability of the benefits was indicated, and the notice was posted throughout the institution. *Compare The Great Atlantic & Pacific Tea Co.*, 192 N.L.R.B. 645, 646 (1971), *enf'd* 463 F.2d 184 (5th Cir. 1972). A clear impression was publicly conveyed to all employees that a wage increase was imminent, and an employee would scarcely expect this employer to renege in such circumstances.

■ An employer may, of course, change the existing conditions of employment even before an election if the change is separately justified by a legitimate business purpose. *NLRB v. Styletek, Div. of Pandel-Bradford, Inc., supra*, 520 F.2d at 280; *G.A.F. Corp. v. NLRB, supra*. Respondent here asserts that he withheld the promised pay increase for such a purpose, namely to avoid a charge by the union that his granting of an increase in January 1, 1975, violated section 8(a)(1). The Administrative Law Judge recognized that an employer's good faith effort to conform to the requirements of the National Labor Relations Act can provide a legitimate business justification for withholding pay increases, *G.A.F. Corp. v. NLRB, supra; NLRB v. Dorn's Transp. Co., supra*, but he concluded, we think justifiably, that respondent was not motivated by a good faith apprehension of being charged with committing an unfair labor practice.

Hesenius told Campbell that he was not granting the pay increase because "the union was around" and, even more significantly, he rejected Campbell's offer to obtain from the union a letter stipulating that it would not file charges whatever raise was given. The Administrative Law Judge was entitled to conclude that an employer who was acting in good faith would have responded differently. Respondent did not indicate that the raise would go through if his legal doubts could be dispelled, and he rejected out of hand Campbell's perfectly reasonable suggestion of securing union approval. *Compare Montana Lumber Sales Inc.*, 185 N.L.R.B. 46 (1970); *Uarco, Inc.*, 169 N.L.R.B. 1153 (1968) (cases where the Board has held employer conduct sufficiently indicative of good faith legal doubts to justify withholding increases).

In light of the foregoing, we sustain the Administrative Law Judge's further conclusion that respondent's statement that he was withholding the promised increase because "the union was around", communicated to the employees by Campbell with Mr. Hesenius' permission, was an attempt to blame the union for the withholding, and amounted to a separate violation of section 8(a)(1). *See The Gates Rubber Co.*, 182 N.L.R.B. 95 (1970).

■ The Administrative Law Judge and the Board also found a separate 8(a)(1) violation in respondent's questioning of employee Campbell on January 9, 1975, regarding the letter from the union charging respondent with committing an unfair labor practice. In deciding whether an employer's questioning of an employee rises to unlawful interrogation, we have said that "[t]he coercive effect of the language used should be determined by the entire factual context in which it is spoken" *NLRB v. Prince Macaroni Mfg. Co.*, 329 F.2d 803, 806 (1st Cir. 1964), *quoting NLRB v. Armco Drainage & Metal Prod.*, 220 F.2d 573, 583 (6th Cir. 1955), *cert. denied*, 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748 (1955), and we usually defer to the Board's determination, *see Corriveau & Routhier Cement Block, Inc. v. NLRB*, 410 F.2d 347, 349 (1st Cir. 1969). The factual context here includes the following: the questioning was conducted by the administrator of the hospital; it occurred during a union organizing campaign; Campbell was questioned in the administrator's office during working hours; the questioning concerned serious charges against the employer, but did not relate to Campbell's individual activities; and Campbell's union affiliation was clear. Moreover, the incident was arguably of the type that might become a "conversation piece" among employees. *Compare NLRB v. Styletek, Div. of Pandel-Bradford, Inc., supra*, 520 F.2d at 282 n.7 *with NLRB v. Garland Corp.*, 396 F.2d 707, 709 (1st Cir. 1968). While the Board's characterization seem to us borderline, we find sufficient factors

present not to disturb the Board's conclusion of a violation at least in light of the other, more substantial findings of violations.

Respondent contends that that part of the Board's order directing it to "Pay to its employees the wage increases that were promised to be effective on January 1, 1975 . . . with interest at 6 percent . . . ." is unenforceable as too speculative a remedy because the actual amount of the increase was never specified ʻand there is no pattern of across-the-board increases against which to measure the new increase.

 The Board's authority to order relief stems from section 10(c) of the Act, 29 U.S.C. § 160(c), which provides that upon finding that an employer has committed an unfair labor practice, the Board shall order the employer "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter . . . ." The remedial power of the Board under this section "is a broad, discretionary one, subject to limited judicial review" *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964), and the Supreme Court has held that an order of the Board will not be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). The policies of the Act include deterring unfair labor practices and making employees whole for losses incurred as a result of such practices. *See Nathanson v. NLRB*, 344 U.S. 25, 27, 73 S.Ct. 80, 97 L.Ed. 23 (1952). Both ends are served by the order here.

To be sure, since no specific amounts were set forth in the employer's notice, the Board will have to exercise care, should it be called upon to establish the amount of the pay increase in a back pay proceeding, not to substitute its own views for those of the employer when it promised a raise. We do not understand the Board as asserting any right to impose a penalty. But while it

may be difficult to reconstruct precisely what the employer had in mind, Hesenius testified that he had "some" increase in mind, and the hospital's year-end financial reports, which he said he intended to use to compute the raises, are presumably available. It seems possible, therefore, that supportable figures can be developed. If this should turn out not to be the case, respondent may, of course, seek review again in this court.

*Enforcement granted.*