NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

HASBRO INDUSTRIES, INC.,
Respondent,

Local 26L, Graphic Arts International
Union AFL–CIO, Intervenor.

No. 81–1227.

United States Court of Appeals,
First Circuit.

Argued Sept. 17, 1981.

Decided Feb. 3, 1982.

Christine Weiner, Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Peter M. Bernstein and Lawrence J. Song, Washington, D. C., were on brief, for petitioner.

Roger S. Kaplan, New York City, with whom Neil M. Frank, Jo-Anne P. Morley, and Jackson, Lewis, Schnitzler & Krupman, New York City, were on brief, for respondent.

* Of the District of Massachusetts, sitting by designation.

1. The Board's decision and order is reported at 254 NLRB No. 70.

Eugene Cotton, Chicago, Ill., with whom Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., was on brief, for intervenor.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and MURRAY,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order finding Hasbro Industries, Inc.[1] guilty of unfair labor practices and ordering it to bargain with Local 26L, Graphic Arts International Union, AFL–CIO (the Union).

Hasbro manufactures and distributes toys, printed materials and related products. It has four facilities in New England, but the dispute before us relates only to a group of printing employees at its main plant located on Newport Avenue, Pawtucket, Rhode Island. One of the principal operational divisions there was the packaging and box-making department, managed by Mr. Sidney Feldman and manned by approximately 45 employees. Within that department was a printing section,[2] consisting at first of 18, and later 15, employees. It is these printing employees with whom we are here concerned.

On January 24, 1977, the Union wrote Hasbro requesting recognition as the bargaining agent of its printing and lithographic employees based on authorization cards signed by 11 of the 18 employees then in the printing section. On the same day, the Union initiated a representation proceeding before the Board. A few days later, Hasbro advised the Union that its representation claim would have to await the outcome of that Board proceeding.

After a hearing on the Union's petition, the Regional Director determined that the printing unit was appropriate and directed an election. As noted, this unit had 18 employees initially, but by the time of the

2. The printing section apparently operated offset presses which printed the labels on the toy packages, play money, and so on.

election it had only 15 by reason of a reduction in force. Originally scheduled for June 1977, the election was postponed at Hasbro's request pending Board review of the Regional Director's decision. That decision was affirmed on or about November 21, 1977, and the election was finally held on December 16, 1977, resulting in seven votes for and eight votes against the Union. (Three additional votes cast by employees who had been laid off as the result of the reduction in force were challenged by Hasbro and invalidated by the Board.)

On December 22, 1977, the Union filed objections to the election. These were sustained by the Regional Director on February 6, 1978, who ordered a second election. On February 16, 1978, the Union filed unfair labor practice charges against Hasbro, and the second election was deferred pending determination of these.

Hearings before an administrative law judge (ALJ) were held in 1978 and 1979 on these and later-filed charges, and the ALJ rendered an opinion in August 1980. While rejecting several of the General Counsel's charges, the ALJ found that Hasbro had committed a series of unfair labor practices, both before and after the election, in violation of section 8(a)(1) of the Act. 29 U.S.C. § 158(a)(1).[3] He further found that Hasbro's refusal to bargain with the Union violated section 8(a)(5), 29 U.S.C. § 158(a)(5), and that its conduct was such as to make the holding of a fair election impossible. He accordingly recommended, in addition to cease and desist orders and the posting of notice, that a *Gissel* order be entered,[4] directing Hasbro to bargain with the Union, as representative of its printing employees. The Board substantially accepted the ALJ's findings and recommendations, and this enforcement proceeding followed.

Hasbro now challenges the Board's findings and rulings, asserting that they are unsupported in fact and legally incorrect. In reviewing the Board's action, we shall first consider its findings of section 8(a)(1) violations, and, at the end, shall consider whether the bargaining order was warranted.

## THE UNFAIR LABOR PRACTICES

### 1. *Wage Increases to Three Employees before the Election*

■ Wage increases were granted to three unit employees—Moreira, Tinley and Goyette—on November 28, 1977. The election was thereafter held on December 16, 1977, that date having been announced on November 21, 1977. The ALJ found that these increases violated section 8(a)(1) because "expressly timed to influence employees in the election." Hasbro responds by pointing out that the increases had been scheduled towards the beginning of 1977 and were therefore merely the consummation of earlier plans made entirely without reference to the election.

The evidence is undisputed that on January 10, 1977, Mr. Feldman, the department manager, scheduled, and listed on the payroll, projected wage increases for Tinley and Moreira. He did the same for Goyette sometime in April 1977, when Goyette was reclassified to a higher grade. Feldman's notations indicated that during 1977 Moreira would go from $4.60 to $5.40 in three steps: a 30-cent increase on February 1, 1977; a 25-cent increase on August 1, 1977; and a 25-cent increase on December 1, 1977. Tinley was listed as going from $3.45 to $3.90 in two steps: a 20-cent increase on July 1, 1977, and a 25-cent increase on December 1, 1977. Goyette was listed as being entitled to three increases: 20 cents on July 20, 1977; 20 cents on October 20, 1977; and 25 cents on November 20, 1977.

**3.** Section 7 of the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, guarantees employees, among other rights, the right to form, join or assist labor organization and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed in section 7."

**4.** *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

The record shows that in the case of Moreira and Tinley the planned raises were all implemented within a short time of the scheduled dates.[5] Goyette's schedule was similarly implemented, except the increase slated for October 20, 1977, was inexplicably omitted. The raises here challenged—all put in effect on November 28—were those scheduled for Moreira and Tinley on December 1, and for Goyette on November 20.

We think there is insufficient evidence to support the ALJ's finding that the increases were "timed" to influence the election. The timing had been determined long before the election was scheduled, and the Company had thereafter followed its schedule with a considerable degree of fidelity.

The ALJ, indeed, did not question the Company's evidence showing that the increases for Moreira and Tinley had been projected before the Union had requested recognition, and, for Goyette, reflected an increase in grade and was planned well before anyone knew there would be an election in mid-December of 1977. Nor is there any doubt that the dates originally scheduled for implementing the raises preceded the election by some several weeks. Under these circumstances, we see no basis for holding that the raises on November 28 were improper under the Act.

■ Conferral of employee benefits while a representation election is pending for the purpose of inducing employees to vote against the Union interferes with the employees' protected right to organize, *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). However, the presumption of illegality of wage increases and other benefits granted during the pendency of a union election is negated if the employer establishes that the conferral and announcement of such benefits are consistent with established company practice or were planned and settled upon prior to the initiation of the Union's organization campaign. *Louisburg Sportswear Co. v. NLRB*, 462 F.2d 380, 384 (4th Cir. 1972); *NLRB v. Otis Hospital*, 545 F.2d 252, 255 (1st Cir. 1976) (where the prospective benefits were already incorporated in the existing terms and conditions of employment, an employer could grant the benefits without fear of violating section 8(a)(1)).

Here there can be no serious contention that the wage increases were not part of an established company procedure. In fact, the ALJ found that "at some point" the three individuals would have received the raises. The Board's unfair practice finding seems to have entirely rested on its surmise that the *timing* of the wage increases was advanced to before the election so as to influence its result. This would have been improper. *NLRB v. Styletek*, 520 F.2d 275 (1st Cir. 1975). But in a case such as *Styletek*, "the company was unable to pinpoint a conclusive reason that justified this particular timetable." 520 F.2d at 281. Hasbro, to the contrary, has demonstrated "a conclusive reason," in the form of a predetermined schedule, which called for making the increases when they were in fact made.[6] Although the Board argues otherwise, the evidence does not permit a reasonable inference that Hasbro had, in the past, ordinarily ignored that schedule. The Board's own rule, as noted in *Styletek*, is that when a representative election is pending, the employer should act as if the Union were not on the scene. 520 F.2d at 281 n.5. Here, Hasbro demonstrably did just that. Indeed, had it withheld the increases until after the election, it would have deviated from this rule. Accordingly, we find that the Board has failed to sustain its burden of showing that the timing of the wage increases was intended to interfere with the employees'

---

5. Moreira received his 30-cent raise on January 31, 1977; his 25 cents on August 1, 1977; and the contested 25-cent raise on November 28, 1977. Tinley received 20 cents on July 11, 1977 and the contested 35 cents on November 28, 1977.

6. It should be borne in mind that the original schedule for the wage increases provided that the raises would be granted on November 20 for one employee and on December 1 for the other two employees. Both of these dates preceded the December 16 election date. The raises were actually conferred on November 28.

exercise of their right to choose the Union as their bargaining representative.

### 2. Coercive Letters

■ Hasbro sent many letters to its printing employees in the brief period before the election urging them to weigh carefully their votes and suggesting strongly that a vote for the Union was not in their best interest. Two of these letters were found by the Board to contain improper threats of reprisal or force or promise of benefit and hence to exceed the free speech rights conferred upon employers by section 8(c) of the Act, 29 U.S.C. § 158(c). Section 8(c) provides,

> The expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice under . . . this subchapter, *if such expression contains no threat of reprisal or force or promise of benefit.* [Emphasis supplied.]

In one letter, dated December 5, 1977, Hasbro listed various benefits it provided, such as educational assistance, scholarship aid for employees' children, blood bank, credit union, and the service award program. It then warned against "the real *risks* which you and your family may face if you make the wrong decision" (emphasis supplied) in the election of December 16. The letter went on to say, "If the Union is successful, the possibility that you and your family may be harmed if there are negotiations causes me great concern." The "dangers" listed from negotiations included the risk that wages and benefits now enjoyed might be lost, the possibility that Hasbro would not reach an agreement with the Union, the possibility of being forced to go on strike and receive no paycheck every Friday, the possibility of being permanently replaced as the result of a strike, and the hardship faced "if the tragedy of a strike should occur."

The second challenged letter was dated December 12, 1977. It stated, "if the Graphic Arts Union gets in here, you risk losing" 28 described benefits, including "Fair wages" and "Overtime pay" and such other items as health and medical coverage, pension plan, paid vacations and holidays, Christmas bonus, personal leave, and lunch and break periods.

Line-drawing in this area is not easy, but we think the Board acted within principles laid down by the Court in *NLRB v. Gissel*, 395 U.S. at 616–20, 89 S.Ct. at 1941–1943, in ruling that these letters went too far. The Court in *Gissel* said that even a sincerely held prediction by the employer of the consequences of voting in the Union may become a retaliatory threat if not "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control. . . ." 395 U.S. at 618, 89 S.Ct. at 1942. Certainly the instant letters point to no objective facts supporting the dire projections therein. These projections were, to be sure, labelled as possibilities, not absolute predictions, but their probability was so emphasized that we think the message could be viewed as tantamount to a prediction.[7] *Gissel* makes clear that the touchstone for determining whether an employer's message is predictive or retaliatory is not simply its literal meaning but rather its overall "import" in the employment setting. 395 U.S. at 617, 89 S.Ct. at 1941. The utterance's implications and nuances are thus highly relevant.

The December 5 letter spoke of the vice-president's "personal concern" lest the employee and his family face "real *risks*" (underscored) if he makes "the wrong decision." It went on to emphasize the vice-president's concern over the "possibility that you and your family may be harmed if

---

7. The Court in *Gissel* went on to prohibit, "*Any* implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him. . . ." 395 U.S. at 618, 89 S.Ct. at 1942 (emphasis supplied). Strikes, permanent replacement and reduced wages de-pend not only on action by the Union but on that of the employer. Thus unsupported predictions of these may imply not only that the employer expects the Union to be aggressive but that he himself will take a particularly hard line if there is a union.

there are negotiations." The risks the employee faced, the letter continued, included possible loss of wages and benefits, the "tragedy" of a strike, and possible "permanent replacement." While this litany can be read as projecting an honest belief that the Union will be so irresponsible and unresponsive to its members' interests as to bring about such things entirely on its own, it can also be considered a covert message that, if the Union comes in, Hasbro will fight it, and its pro-union employees, tooth and nail, provoking confrontations which will result in lost benefits, strikes and the replacement of pro-union employees. In *Gissel*, the Court criticized as improper an employer's "basic assumption [expressed in messages to employees] that the Union, which had not yet even presented its demands, would have to strike to be heard." 395 U.S. at 619, 89 S.Ct. at 1942. These letters convey a similar basic assumption.

The second letter, dated December 12, 1977, went to the extreme of listing basics such as "fair wages" and overtime, health and pension benefits, as among 28 specific items which the employees risked losing if they voted in the Union. The ALJ concluded that the letter was so one-sided as to go beyond merely stressing that, as bargaining was a two-sided affair, it might result in diminution of existing benefits as well as

the possibility of increased benefits. Rather the letter implied, or so the Board felt, that the Company would retaliate against unionization by withdrawing benefits if it could.

▮ It is within "the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." 395 U.S. at 620, 89 S.Ct. at 1943.[8] *See, e.g., NLRB v. Marine World USA*, 611 F.2d 1274, 1277 (9th Cir. 1980). Here the ALJ found that certain of Hasbro's letters were proper and that these two were not. Some of the letters exonerated by the ALJ were themselves borderline. The ALJ's determination seems to us to reflect a conscientious choice and to fit reasonably within the section 8(c) guidelines set out in *Gissel*. We are therefore constrained to affirm the Board's findings.

### 3. Interrogation of Employee Pasadas by Two Hasbro Executives

Antonio Pasadas, a unit member, met with two of Hasbro's vice-presidents in the employer's cafeteria on December 13, 1977, three days before the election. The ALJ found that Pasadas was asked why he wanted the Union; this the ALJ found to be coercive and violative of section 8(a)(1).[9]

---

**8.** This and much other language in *Gissel* contradicts Hasbro's argument that because an employer's letters are "written instruments," a reviewing court owes no deference to the Board. *Cf. Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1256 (5th Cir. 1978). Obviously courts are not bound to accept the Board's interpretation in all section 8(c) cases, and should review them carefully given the importance of protecting the employer's as well as employees' rights. But the Board's assessment of the overall import of the employer's comments in the industrial setting is entitled to respect. It is not the legal effect of a writing that is here being construed but rather its probable impact on employees. 395 U.S. at 617, 89 S.Ct. at 1941.

**9.** Pasadas gave the following testimony regarding the meeting between himself and the two vice-presidents:

Q. Directing your attention to December 13th 1977, did you have a meeting with Mr. Maxwell and Mr. Fornal?

A. Yes.

Q. Could you tell us where this meeting was?

A. In the cafeteria.

Q. Was there anyone else besides Mr. Maxwell, Mr. Fornal, and yourself present? At that meeting?

A. Yes. Me, and Mr. Maxwell and Mr. Fornal.

Q. Can you tell us what was said at that meeting?

A. Well, when I went there they asked me why I want the Union. If I had some problem. So I answered I don't like to move off of one press onto another press, and I, of course, I want some more money.

And I asked if the Union come in, would some people I can't explain it in English.

THE INTERPRETER: He asked if the Union didn't come in would some of the people that were involved with the Union get thrown out, and they responded by saying no. And they told me again do the best you think for you and for your family.

■ Hasbro challenges the ALJ's crediting of Pasadas's testimony rather than that of the two executives. Hasbro emphasizes Pasadas's language difficulties (a standby interpreter was used before the ALJ, although Pasadas answered in English most of the time), and points to the categorical denial by its executive of having asked Pasadas why he wanted a union. The ALJ said he credited Pasadas because his testimony was consistent and because of a record of the conversation he purportedly wrote later (although the value of this note is itself in dispute). We find nothing in the record which would warrant overruling the ALJ's determination of credibility. The Company's own witnesses were not in every respect consistent. Particularly where Pasadas's grasp of English was an issue, the ALJ was in the best position to judge. Credibility judgments are not an exact science, and can be abused; but the answer does not lie in remaking them at an appellate level unless it is clearer than it is here that error was committed.

Hasbro contends that even accepting Pasadas's version of events in toto, there is insufficient evidence that what was said was coercive.

■ Questioning an employee regarding his union sentiments is not per se violative of section 8(a)(1). The issue is whether the effect of the questioning is to restrain or coerce the employee in the exercise of his organizational rights under section 7. *Dow Chemical Co. v. NLRB*, 660 F.2d 637 (5th Cir. 1981); *Paceco v. NLRB*, 601 F.2d 180, 182 (5th Cir. 1979); *NLRB v. Douglas Division*, 570 F.2d 742, 745 (8th Cir. 1978); *NLRB v. Otis Hospital*, 545 F.2d 252, 256 (1st Cir. 1976).

The entire factual context in which the language is spoken is relevant to determining its coercive effect. *NLRB v. Prince Macaroni Manufacturing Co.*, 329 F.2d 803, 806 (1st Cir. 1964); *NLRB v. Otis Hospital*, 545 F.2d at 256. *See Paceco v. NLRB*, 601 F.2d 180 (reflecting Fifth Circuit's application of factors set out in *Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1964), as augmented).

■ On this record, we believe the Board was entitled to find the interrogation coercive and violative of section 8(a)(1). The interrogators were both vice-presidents, high in the Company hierarchy. They initiated the meeting, which was held during working hours three days before the election. The object of their individual attention was a low-level employee of Portuguese background, who spoke English with difficulty. Being asked to tell, "Why I want the union. If I have some problem," by such august persons, and in these circumstances, could convey a sense of pressure. The interview was conducted without explanation of the purpose for which the information sought would be used. While Pasadas was reassured that pro-union people would not be discharged after the election and to do what was best for himself and his family, the asking of these questions in this isolated setting to a single employee could fairly be considered coercive.

4. *Feldman's Remarks to Beaucage regarding Loss of Unit's Work*

Sidney Feldman was manager of the 45-member packaging and box-making department of which the printing unit formed a part (comprising about one-third of its employees). The ALJ credited the testimony of Jean Beaucage, a unit member (and discredited Feldman's denial) that on December 15, 1977, the day before the election, Feldman told him that Hasbro "would never let another union in here . . . they would farm out the work or barring that, they would close down the printing department for a year and take a business loss and reopen after a year." (The ALJ also credited Beaucage's testimony that in January 1978, Feldman said he "wasn't kidding . . . about closing the plant down," and would deny making the statement if asked.) The ALJ and Board found the December 15, 1977 statement to Beaucage to violate section 8(a)(1) (the January 1978 statement

Q. [By Mr. Feaster] For family, did you say? A. Yes.

was not charged or treated as a separate violation).

■ As we see no ground for rejecting the ALJ's credibility finding, we are left only with whether Beaucage's version of his conversation with Feldman supported the finding of a section 8(a)(1) violation. Beaucage testified that Feldman asked to see him while Beaucage was sitting up on a press at work. Beaucage stopped what he was doing and got down. Feldman then asked,

> friend to friend, now that the campaign is winding down to its last final hours, do you think ... the company would allow another union to come into the plant?

Beaucage replied, "Yes," indicating that he believed Hasbro could well afford it. He opined that Hasbro was only really worried about unionization spreading to the other departments.

To this Feldman replied, "No," going on to say,

> I don't know what they're going to do. They don't tell me anything. But they would never let another union in here.... They would farm the work out before they would.

When Beaucage expressed doubts as to Hasbro's ability to farm the work out and maintain schedule, Feldman said, "if they had to, Hasbro would revamp the whole—" "the rest of the shop and give it to an outside printing, if they had to." Feldman went on to say that "barring that, they would close down the Print Department for a year and take a business loss, and reopen after a year." Feldman's parting remark, after Beaucage persisted in being skeptical, was, "You remember I said this."

We sustain the Board's finding of violation. Feldman's statement that the work would be farmed out cannot be defended as merely "a prediction as to the likely economic consequences of unionization." *NLRB v. River Togs, Inc.*, 382 F.2d 198, 201 (2d Cir. 1967). Economics were not mentioned, nor were any other factors outside Hasbro's control. *See NLRB v. Yokell*, 387 F.2d 751, 756 (2d Cir. 1967). Rather the thrust of the statement was that Hasbro "would never let another union in here.... They would farm the work out before they would." This was, in the words of *Gissel*, purely and simply an "implication that [the] employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him." 395 U.S. at 618, 89 S.Ct. at 1942.

It is true that Beaucage on cross-examination retreated somewhat from his direct testimony. He conceded that Feldman told him the Company and the Union would first bargain, and that "if a result was not reached ... then they would farm the work out." Even as so tempered, however, Feldman's utterance could be read as implying that Hasbro would close the printing section after complying minimally with whatever legal obligations it had. We think an implied threat of retaliation could reasonably be drawn.

We find no merit in Hasbro's defenses that Feldman was a mere low-level supervisor engaging in a friendly chat, *cf. Federal-Mogul Corp. v. NLRB*, 566 F.2d at 1257, and that his disavowal of being privy to the Company's plans reduced his remarks to the level of personal opinion. Feldman was manager of a 45-employee division of which Beaucage's 15-man unit was but a part. There is no reason to believe that employees such as Beaucage regarded the division manager as less than an arm of management. The conversation, furthermore, was purposefully initiated by Feldman during working hours suggesting that it was no chance encounter. And the ALJ could properly give but little weight to Feldman's disavowal of inside knowledge—his managerial position and the circumstances of the visit would speak louder than a pro forma disclaimer.

We affirm the finding of section 8(a)(1) violation in this regard.

### 5. *Surveillance of Mark Stanley*

The ALJ found that following the election (and a Christmas party) on December 16, Feldman said to bargaining unit employee Mark Stanley, "We know how you

voted. They or I wouldn't hold that against you, and that there's three that I am out to get. . . . You know the three." This was found to give the impression of surveillance of Stanley's union activities and sentiments.

 As the Fifth Circuit said in *NLRB v. Mueller Brass Co.*, 509 F.2d 704 (5th Cir. 1975), "surveillance" only violates the Act if, within section 8(a)(1), it tends to interfere with, restrain or coerce Union activities. Surveillance thus becomes illegal

 because it indicates an employer's opposition to unionization, and the furtive nature of the snooping tends to demonstrate spectacularly the state of the employer's anxiety. From this the law reasons that when the employer either engages in surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion, retaliation, etc.

*Quoting Hendrix Manufacturing Co. v. NLRB*, 321 F.2d 100, 104–05 n.7 (5th Cir. 1963). Given Stanley's well-known adherence to the Union, the mere statement, "we know how you voted," coupled with, "They or I wouldn't hold that against you," would seem harmless, falling within the rule that an employer's mere "acknowledgment" of an employee's union activity is not unlawful. *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 114 (1st Cir. 1978). But the additional language, "that there's three I'm out to get," changes the complexion. This threat suggests the Company is keeping track of union activity and is ready to hold it against employees generally even if not against Stanley at the precise moment. We think the remark sufficiently coercive in character to support the Board's finding of violation.

6. *Feldman's Alleged Remarks to Enes, Pasadas and Moreira*

At the hearing before the ALJ, Enes, Pasadas and Moreira, who were bargaining unit employees, all testified that on Decem-ber 16, 1977—after the election results were announced—manager Feldman told them, in effect, that the employees were lucky the Union had not won the election since if the unit were unionized the Company would close the printing department. Counsel for Hasbro did not object to this particular testimony, but at various points in the hearing, both before and after, he objected to the introduction of evidence of other incidents which, like this one, were not specifically mentioned or charged as violations in the complaint. The General Counsel insisted, however, that such evidence was relevant by way of "background" and to show animus towards the Union. On that basis, the ALJ admitted it, but on several occasions stated specifically that it would not be used as the basis of independent unfair labor practice findings because not charged in the complaint. The ALJ reiterated that position in his decision, noting that he had received such evidence on the General Counsel's representation that it was for "background," but would not utilize it to find violations not alleged. Noting that the General Counsel did not move to amend the complaint, and Hasbro did not seek to adduce evidence on such matters, the ALJ ruled that the additional matters were not fully litigated and that any findings of a violation with respect thereto would be improper.[10]

The Board nonetheless indicated that these purported remarks formed one of a number of incidents as to which the ALJ had found section 8(a)(1) violations, saying of all such supposed findings, "We agree."

 It is hard to know what to make of this. The Board could, of course, make additional unfair labor practice findings of its own in the absence of findings by the ALJ. The parties seem to believe that this is what the Board meant to do here. But the Board nowhere indicated that it was consciously making a finding of new unfair

10. While the ALJ declined to find unfair labor practices with respect to these additional matters, he did state, as further justification for the bargaining order, that he credited Enes, Pasadas and Moreira, that Feldman told them on December 16, 1977, that they were lucky the Union did not win because the printing section would be closed.

labor practice violations in place of the ALJ's express silence. Rather it simply attributed to the ALJ a section 8(a)(1) finding he did not make and said that it agreed. We are unwilling to translate this into an independent Board finding for two reasons. First, the Board gave no indication of intending to make an independent finding— especially not one that flew in the face of its own ALJ. To the contrary, the Board thought it was sustaining its ALJ. Second, were the Board to have made a finding of its own, we have serious doubts that it could stand, given the ALJ's express reassurances during the hearing, and later, that evidence of this character would not be used as the basis of an additional unfair labor practice violation. *NLRB v. I. Posner, Inc.*, 304 F.2d 773, 774 (2d Cir. 1953). *See also Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055, 1073–75 (1st Cir. 1981). Basic fairness would prevent the Board from going back on promises thus given. We accordingly do not accept the existence of any valid finding of a separate section 8(a)(1) violation based on this incident. We agree with the ALJ, however, that the testimony was properly received for its bearing on those charges that were under consideration, and on the bargaining order.

### 7. *Wage Increases Granted to Unit Employees Following the Election*

The Board found that the Company violated section 8(a)(1) of the Act when on January 7, 1978, while objections to the election were pending, the Company granted wage increases to all bargaining unit employees. Although the Board conceded that general wage increases were granted by the Company each January, it nevertheless concluded that the increases following the election both far eclipsed those granted in the previous year and were substantially higher than those granted non-bargaining unit employees.

The Company argues that the Board's findings are erroneous since it failed to consider the Company's reliance on an industry wage survey which revealed that, in the period preceding the 1978 wage increases, Hasbro's salaries were below the industry mean. The ALJ did note and examine the wage survey upon which the wage increases were allegedly based. However, after examining the wage increases in the light of the wage survey, he concluded that the wages granted to the bargaining unit employees were not based solely on the recommendations of the industry survey but were granted in an attempt to both demonstrate to the unit employees that a union was unnecessary and erode support for the Union.

In *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964), the Supreme Court ruled that the conferral of employee benefits during the pendency of an election unlawfully interferes with the employees' right to organize if the benefit is granted in an attempt to erode employee support for the Union.

Post-election benefits granted while objections are pending or while there is a possibility of a rerun election may also be regarded as an unlawful interference with an employee's right to support unionization. *NLRB v. Styletek*, 520 F.2d 275, 280 (1st Cir. 1975); *NLRB v. Gruber's Super Market, Inc.*, 501 F.2d 697, 701–03 (7th Cir. 1974); *Luxuray of New York v. NLRB*, 447 F.2d 112, 118–19 (2d Cir. 1971); *General Teamsters and Allied Workers Local Union v. NLRB*, 427 F.2d 582, 586 (D.C.Cir.1970). In *NLRB v. Gotham Industries, Inc.*, 406 F.2d 1306 (1st Cir. 1969), this court articulated the preferred procedure for proving an "unlawful motivation" for a challenged wage increase or benefit. In *Gotham*, we ruled that in order for the Board to establish a section 8(a)(1) violation, it was incumbent upon the Board to show that the benefit was improperly motivated. If the Board was able to fulfill this initial requirement, the employer then was required to come forward with affirmative evidence of proper business justifications for the increase. If the employer was able to produce a proper business justification for the challenged wage benefit, it became incumbent upon the Board to show that the benefit was

primarily motivated by an anti-union purpose. *NLRB v. Gotham Industries, Inc.,* 406 F.2d at 1309; *cf. NLRB v. Wright Line,* 662 F.2d 899 (1st Cir. 1981) (where in an improper discharge case this court stated that while an employee may bear a burden of production to rebut the general counsel's prima facie case the burden of persuasion at all times remains upon the Board).

■ The Company argues that the wage increases were part of a long-standing Company policy to grant annual wage increases each January and that the amount of the increases was determined by the non-competitive nature of its wage levels compared to other companies participating in a local wage survey of industry wages, its profit position and ability to absorb costs, its labor contract settlements and several other factors. The ALJ, on the other hand, found that while the giving of wage increases was part of a long-standing Company policy that contained no anti-union purpose, the amount of the particular wage increases granted to bargaining unit employees so far exceeded the norm as to show an intention to erode the employees' support for the Union. This improper motive was demonstrated by the fact that the increases granted to bargaining unit employees both were across-the-board increases unrelated to initial salaries and were significantly higher than the increases granted to most of the non-unit employees.

Our review of the evidence leads us to conclude that there is sufficient record support for the ALJ's finding that the Company's stated justifications did not form the true motive for the challenged increases.

The record reveals that both in terms of flat rate increases and as a percentage of current salary, the wage increases granted to bargaining unit employees were substantially larger than those granted to most non-bargaining unit employees and that the wage increases were significantly greater than those granted unit employees during the previous year.[11] Moreover, it was open to the ALJ to conclude that Hasbro never proved that it set the 1978 wages for unit employees strictly by reference to prevailing industry wage levels—or, indeed, that before the Union arrived on the scene, Hasbro had made it a practice to refer to industry wage levels in the printing unit.

We conclude that the Board's finding that the January 1978 increases were granted in an attempt to erode support for the Union and constituted a section 8(a)(1) violation is supported by substantial evidence and must stand.

## THE BARGAINING ORDER

■ The Board, as had the ALJ, found that the Company's actions violated section 8(a)(5) of the Act and warranted the issuance of a remedial bargaining order. As a basis for issuing the bargaining order in lieu of holding a second election, the Board emphasized the high wage increases granted bargaining unit employees immediately after the election. The Board also stated that respondent, as part of an overall design to thwart the free will of its 15 unit employees, had made it clear to four employees that selecting the Union would mean closing the department; distributed

11. The record reveals that ten of the twelve bargaining unit employees received wage increases of 80 cents per hour, one received a 70-cent per hour increase and another received a 60-cent per hour increase. Of the 487 employees listed in Joint Exhibit Number 5 only 20 other employees received wage increases of 80 cents or more per hour, with the average increase for all employees being less than 40 cents per hour. Thus, while only seven percent of the workers listed in Joint Exhibit Number 5 received increases of 80 or more cents, approximately 73 percent of the bargaining unit employees received such increases. In addition even if we were to review the increases as a percentage of base salary, as the Company suggests, such an analysis is not fatal to the Board's reasoning. While it may be true, as the Company argues, that 28 percent of the non-unit employees who received wage increases received percentage increases of 14 percent or more, it does not explain why 100 percent of the bargaining unit employees received such increases. In addition, of the non-unit employees who received flat increases of 80 cents or more, only 75 percent of them received a 14 percent or greater increase in their salary while all of the bargaining employees were granted such a percentage increase.

letters to each employee's home advising that a union victory would in essence be tantamount to the sacrifice of existing benefits; gave one employee the impression that his union activities were under surveillance; and subjected another employee to interrogation concerning his union sentiments. The Board found it unlikely that traditional remedies would be effective in overcoming the lingering coercive effects of the Company's actions on "this relatively small unit."

We think these findings are supported and that they justified the issuance of a bargaining order. *NLRB v. Gissel*, 395 U.S. at 614–15, 89 S.Ct. at 1940. While we do not accept the Board's finding of a section 8(a)(1) violation stemming from pay raises given to Moreira, Tinley and Goyette on November 28, 1977, we do not perceive this erroneous finding as forming a critical aspect of the Board's reasoning in issuing a bargaining order. The Board itself laid greatest stress upon the post-election pay increases. Nor do we find it of any great consequence that the Board labelled Feldman's alleged remarks to Enes, Pasadas and Moreira as a section 8(a)(1) violation; the ALJ credited testimony that these remarks were, in fact, made, and the ALJ and Board were entitled to consider this evidence in determining whether or not to issue a bargaining order, although not for purposes of establishing a separate section 8(a)(1) violation.

We accordingly affirm the Board's findings of section 8(a)(1) violations, except for those stemming from the November 28, 1977 wage increases, and Feldman's December 16, 1977 remarks to Enes, Pasadas and Moreira. We enforce the Board's order, including the bargaining order, except we direct the Board to delete therefrom all references and findings concerning the disallowed section 8(a)(1) violations.

*So ordered.*